139 P.3d 1096 (2006)
LEWIS COUNTY, Appellant,
v.
WESTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD, Eugene Butler, Edward G. Smethers, Douglas H. Hayden, Annette H. Yanisch, Brenda Boardman, Dorothy L. Smith, Debra Ertel Burris, Michael T. Vinatieri, Deanna M. Zieske, Vince Panesko, John T. Mudge, Evaline Community Association, Susan Roth, Richard Roth, Karen Knutsen, and Valerie Gore, Respondents.
No. 76553-7.
Supreme Court of Washington, En Banc.
Argued November 10, 2005.
Decided August 10, 2006.
*1098 Alexander Weal Mackie, Perkins Coie LLP, Olympia, Douglas Emry Jensen, Lewis County Prosecutor's Office, Chehalis, for Petitioner/Appellant.
Lewis Handfield Zieske, Deanna Zieske, Chehalis, for Appellee/Respondents.
Timothy E. Allen, Law Offices of Gulliford, McGaughey & Du, Bellevue, Tim Trohimovich, Futurewise, Seattle, for Amicus Curiae, Futurewise.
Maureen A. Hart, Olympia, Alan D. Copsey, Attorney General's Office, Olympia, for Amicus Curiae, State of Washington Attorney General.
ALEXANDER, C.J.
¶ 1 After failing four times to satisfy the Western Washington Growth Management Hearings Board (Board) that it properly designated agricultural lands for conservation under the Growth Management Act (GMA), chapter 36.70A RCW, Lewis County now asks us to reverse the latest Board orders rebuffing its efforts. We conclude that the Board incorrectly defined agricultural land in reviewing Lewis County's 2003 ordinances. Accordingly, we reverse the Board's conclusion that the county violated the GMA by focusing on the farm industry's projected needs, rather than on soil and land characteristics, in designating agricultural lands for conservation. We also remand the case to the Board to determine whether the county's designations of agricultural land comply with the GMA, using the correct definition of agricultural land.[1] We conclude, however, that the Board did not err by invalidating the ordinances that: (a) allowed non-farm uses within designated agricultural lands, and (b) excluded "farm centers" and farm homes from those lands. Therefore, we partially affirm the Board's orders.

I
¶ 2 Lewis County has long struggled to meet GMA requirements to designate and *1099 conserve agricultural lands. In June 2000, March 2001, and July 2002, the Board found the county's efforts noncompliant.
¶ 3 In response to the Board's September 8, 2003, deadline to achieve GMA compliance, the county staff prepared a report explaining how it identified agricultural lands to be conserved. The 2003 staff report said that of the 1,117 farms existing in Lewis County as of the 1997 census, only 176 farms had gross sales of $25,000 or more, and only 161 of them were larger than 180 acres. The report also said that of about 150,000 acres eligible for agricultural designation based on soil type, about 50,000 had no recent agricultural activity. The report described a decline in dairies and field crops, an absence of "significant clusters" of organic farms, and a poultry industry constrained by a lack of water rights. Clerk's Papers (CP) at 242. The report also said no land conservation was needed for the hay and Christmas tree industries because they do not depend on soil, and "[g]rass hay in particular is a marginal operation, in that in good years the return is often barely enough to pay taxes on the property." Id. at 254. Finally, the staff report said most Lewis County farms are not economically self sufficient and therefore need "non farm income" for survival. Id. To address that need, the report recommended allowing each farm to have a "farm center" of up to five acres where rural commercial and industrial uses would be allowed. Id. at 255.
¶ 4 The Lewis County Planning Commission held public hearings and approved the staff report almost entirely. It recommended that the Lewis County Commission designate 54,500 acres of agricultural land, "appropriate in location and amount to reasonably conserve the land-based needs of the commercial agriculture industry for the foreseeable future."[2]Id. at 283. On September 8, 2003, the Lewis County Commission adopted by ordinance the planning commission findings and most of its recommendations, along with maps designating an agricultural zone of about 54,400 acres. And while prohibiting certain non-farm land uses, the commission allowed othersincluding residential subdivisions, home-based businesses and telecommunication facilitiesto be located in agricultural lands as long as they met certain conditions.[3] The ordinances designated 13,767 of "Class A" farmlands, characterized by prime farm soils, over 40,000 acres of "Class B" farmlands, and "[f]armlands of [l]ocal [i]mportance." Id. at 670. The commission removed some lands from designation because they: (1) had "already been divided," (2) "lost irrigation rights," or (3) were "isolated and in areas where land development and potential changes create the potential for conflict and . . . significant change." Id. at 283. The latter included lands near Interstate 5 where the county wants to attract "major industry." Id.
¶ 5 The county's designation of 54,400 acres of agricultural lands, as compared with 66,000 acres receiving special agricultural tax status and 283,000 acres of land with prime farm soils in Lewis County, was controversial. In January 2004, the Board held a hearing to review citizen petitions challenging the county's 2003 actions and to determine GMA compliance.[4] The citizen petitioners, using soil and aerial maps, claimed to identify 140,645 acres that were currently or recently used for agriculture and that should have been conserved. In February 2004, the Board issued a 49-page order concluding that Lewis County still failed to comply with the GMA. The Board reasoned as follows:
The GMA defines the requirements for designating natural resource lands based on the characteristics of the lands. Instead of basing its designation decisions on the characteristics of agricultural land, Lewis County focused its decision-making on its assessment of the needs of the local agricultural industry. . . . Historically, in *1100 Lewis County as well as in other counties, the agricultural industry has changed as the market for agricultural products changed. Agricultural economists are not able to predict which products will be in demand next year, let alone for the foreseeable future. The legislature, therefore, did not tie the designation of agricultural lands to economic conditions which shift unpredictably but to the characteristics of the land. The moving concern underlying the GMA's requirement for designation and conservation of agricultural lands is to preserve lands capable of being used for agriculture because once gone, the capacity of those lands to produce food is likely gone forever.
CP at 634. The Board invalidated the ordinances and maps that: (a) designated the agricultural lands to be conserved, (b) excluded "`farm centers'" and farm homes from designated agricultural lands, (c) allowed nonagricultural uses on the designated lands, and (d) required "`sufficient irrigation capability'" for designation as Class A farmland.[5] CP at 674, 675. In a May 2004 order on reconsideration, the Board said that "until the County utilizes a compliant approach . . . potential agricultural resource lands in the rural zones must be preserved from incompatible development so that they will be available for assessment under a compliant approach."[6]Id. at 684.
¶ 6 Lewis County appealed both 2004 orders to the Lewis County Superior Court. On December 23, 2004, the superior court affirmed the Board's orders, agreeing with the Board that "the . . . `needs of the industry' argument is clearly erroneous" and that "the definition of long-term significance refers to the growing capacity and productivity of the soil." Id. at 10. We granted review.

II
¶ 7 The Growth Management Hearings Board is charged with adjudicating GMA compliance and invalidating noncompliant plans and development regulations. RCW 36.70A.280, .302. The Board "shall find compliance" unless it determines that a county action "is clearly erroneous in view of the entire record before the board and in light of the goals and requirements" of the GMA. RCW 36.70A.320(3). To find an action "clearly erroneous," the Board must have a "firm and definite conviction that a mistake has been committed." Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County, 121 Wash.2d 179, 201, 849 P.2d 646 (1993). On appeal, we review the Board's decision, not the superior court decision affirming it. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 553, 14 P.3d 133 (2000) (hereinafter referred to as Soccer Fields). "`We apply the standards of RCW 34.05 directly to the record before the agency, sitting in the same position as the superior court.'" Id. (quoting City of Redmond v. Central Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 45, 959 P.2d 1091 (1998)).
¶ 8 The legislature intends for the Board "to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of" the GMA. RCW 36.70A.3201. But while the Board must defer to Lewis County's choices that are consistent with the GMA, the Board itself is entitled to deference in determining what the GMA requires. This court gives "substantial weight" to the Board's interpretation of the GMA. Soccer Fields, 142 Wash.2d at 553, 14 P.3d 133.[7]
*1101 ¶ 9 Under the Administrative Procedure Act (APA), chapter 34.05 RCW, a court shall grant relief from an agency's adjudicative order if it fails to meet any of nine standards delineated in RCW 34.05.570(3). Here, Lewis County asserts that the Board erroneously applied the law, warranting relief under RCW 34.05.570(3)(d), and engaged in an unlawful decision-making process. RCW 34.05.570(3)(c). The burden of demonstrating that the Board erroneously applied the law or failed to follow prescribed procedure is on the party asserting error. Soccer Fields, 142 Wash.2d at 553, 14 P.3d 133. Our review of issues of law under RCW 34.05.570(3)(d) is de novo. Thurston County v. Cooper Point Ass'n, 148 Wash.2d 1, 8, 57 P.3d 1156 (2002). "On mixed questions of law and fact, we determine the law independently, then apply it to the facts as found by the agency." Id. (citing Hamel v. Employment Sec. Dep't, 93 Wash.App. 140, 145, 966 P.2d 1282 (1998), review denied, 137 Wash.2d 1036, 980 P.2d 1283 (1999)).

III
¶ 10 Under the GMA, Lewis County must designate "[a]gricultural lands that are not already characterized by urban growth and that have long-term significance for the commercial production of food or other agricultural products." RCW 36.70A.170(1)(a). In addition, the county must adopt development regulations "to assure the conservation of" those agricultural lands designated under RCW 36.70A.170. RCW 36.70A.060(1).[8] The parties in this case offer contrary definitions of the lands subject to these requirements. As a threshold matter, then, we must identify the correct definition of "agricultural lands" under the GMA.
¶ 11 Lewis County designated agricultural lands based on its own definition: "those lands necessary to support the current and future needs of the agricultural industry in Lewis County, based upon the nature and future of the industry as an economic activity and not on the mere presence of good soils." CP at 418. The Board called the county's definition clearly erroneous, saying, "We note that throughout the GMA and the court decisions construing it the focus is on the nature of the land, not on the nature of the agricultural industry that is using the land at any given time." Id. at 640. The Board also said "[t]he GMA calls for designation of agricultural lands based on characteristics of the land" that affect long-term production capability. Id. But to be guided strictly by the physical nature of the land would stifle economic development in counties like Lewis, which have a significant amount of potentially good farmland, much of which is unproductive. For reasons set forth below, we conclude that the Board's and county's definitions of agricultural land are both incorrect.
¶ 12 The GMA defines agricultural land as "land primarily devoted to the commercial production of horticultural, viticultural, floricultural, dairy, apiary, vegetable, or animal products or of berries, grain, hay, straw, turf, seed, Christmas trees . . . or livestock, and that has long-term commercial significance for agricultural production." RCW 36.70A.030(2). Thus, the legislature established that agricultural lands are those which (1) are "primarily devoted to" commercial agricultural production, and (2) have "long-term commercial significance" for such production. RCW 36.70A.030(2). We now turn to what these terms mean.
¶ 13 This court previously addressed the meaning of the term "primarily devoted to" in City of Redmond v. Central Puget Sound Growth Management Hearings Board, 136 Wash.2d 38, 959 P.2d 1091 (1998) (hereinafter referred to as Benaroya I),[9] a case in which *1102 landowners challenged designation of their land as agricultural. We said there that land is primarily "`devoted to'" commercial agricultural production "if it is in an area where the land is actually used or capable of being used for agricultural production," and that a landowner's intended use of land is not conclusive. Id. at 53, 959 P.2d 1091.
¶ 14 In the present case, the Board relied partly on the aforementioned language in concluding that Lewis County improperly excluded from designation those lands that are "capable of being used" for farm production. CP at 637. But Benaroya I dealt only with whether land is "`primarily devoted to'" farming under RCW 36.70A.030. Benaroya I, 136 Wash.2d at 49, 959 P.2d 1091. The other question in designating agricultural land, neglected by the Board in this case, is whether land also has "long-term commercial significance" for farm production.
¶ 15 The GMA says that long-term commercial significance "includes the growing capacity, productivity, and soil composition of the land for long-term commercial production, in consideration with the land's proximity to population areas, and the possibility of more intense uses of the land." RCW 36.70A.030(10) (emphasis added). Thus, counties must do more than simply catalogue lands that are physically suited to farming. They must consider development prospects (the "possibility of more intense uses") in determining if land has the enduring commercial quality needed to fit the agricultural land definition.
¶ 16 While this court has not previously interpreted RCW 36.70A.030(10), we approve of the approach used by the Court of Appeals in Manke Lumber Co. v. Diehl, 91 Wash.App. 793, 959 P.2d 1173 (1998), review denied, 137 Wash.2d 1018, 984 P.2d 1033 (1999). In Manke, Mason County challenged a Board decision to invalidate its designation of forest lands, subject to the same GMA conservation requirements as agricultural lands. In holding that the Board erred, the court relied largely on WAC 365-190-050,[10] a Washington Department of Community, Trade and Economic Development regulation designed to guide counties in determining which agricultural and forest lands have "long-term commercial significance." That regulation says that counties
shall also consider the combined effects of proximity to population areas and the possibility of more intense uses of the land as indicated by:
(a) The availability of public facilities;
(b) Tax status;
(c) The availability of public services;
(d) Relationship or proximity to urban growth areas;
(e) Predominant parcel size;
(f) Land use settlement patterns and their compatibility with agricultural practices;
(g) Intensity of nearby land uses;
(h) History of land development permits issued nearby;
(i) Land values under alternative uses; and
(j) Proximity of markets.
WAC 365-190-050(1).[11] The court in Manke determined that the Board misapplied the GMA, and that the county could limit forest land designations to parcels of at least 5,000 acres that have a forest tax classification because the guidelines allow consideration of "predominant parcel size" and "tax status" in determining long-term significance. See Manke, 91 Wash.App. at 807-08, 959 P.2d 1173.
*1103 ¶ 17 In sum, based on the plain language of the GMA and its interpretation in Benaroya I, we hold that agricultural land is land: (a) not already characterized by urban growth (b) that is primarily devoted to the commercial production of agricultural products enumerated in RCW 36.70A.030(2), including land in areas used or capable of being used for production based on land characteristics, and (c) that has long-term commercial significance for agricultural production, as indicated by soil, growing capacity, productivity, and whether it is near population areas or vulnerable to more intense uses. We further hold that counties may consider the development-related factors enumerated in WAC 365-190-050(1) in determining which lands have long-term commercial significance. We, therefore, remand this case for the Board to apply the correct definition of agricultural land in determining whether Lewis County's 2003 ordinances complied with RCW 36.70A.170(1).

IV
¶ 18 The respondent citizens in this case argue that "[n]owhere in the GMA or in the implementing WACs is there authority to limit agricultural resource lands designations using an industry needs assessment." Br. of Resp'ts at 10. While it is true that no statute specifically authorizes counties to weigh industry needs above all other considerations in designating and conserving agricultural land, this does not mean the GMA prohibits such an approach. As noted above, the GMA's stated intent is to recognize the "broad . . . discretion" of counties to make choices within its confines. RCW 36.70A.3201. Because the GMA does not dictate how much weight to assign each factor in determining which farmlands have long-term commercial significance, and because RCW 36.70A.030(10) includes the possibility of more intense uses among factors to consider, it was not "clearly erroneous" for Lewis County to weigh the industry's anticipated land needs above all else. If the farm industry cannot use land for agricultural production due to economic, irrigation or other constraints, the possibility of more intense uses of the land is heightened. RCW 36.70A.030(10) permits such considerations in designating agricultural lands. Indeed, Manke involved some of the same considerations cited in the Lewis County staff report, undersized parcels and possible conflicts with nearby development. Therefore, the Board erred in concluding that Lewis County violated the GMA by designating agricultural lands based on the local farm industry's anticipated needs.
¶ 19 However, we do not decide whether Lewis County, in focusing on the needs of the local agriculture industry, went beyond the considerations permitted by WAC 365-190-050 and RCW 36.70A.030 in designating agricultural lands. Unfortunately, Lewis County's briefs do not explain the extent to which the county applied the specified factors.[12] And while Lewis County Ordinance 1179C does spell out in detail how the county considered WAC 365-190-050 factors in mapping agricultural lands,[13] the record does not *1104 indicate whether the county used permissible criteria in other decisions not explicitly tied to the WAC factors. For example, in not designating Christmas tree farms as agricultural land because they do not depend on a particular soil type, the county could have been considering the soil composition factor listed in RCW 36.70A.030(10). But in light of the Christmas tree industry's relatively robust $19.8 million in annual sales, it is not apparent why Lewis County would "consider" soil in this way, excluding productive tree farms from designated agricultural lands simply because they don't need the types of prime soil that other farm sectors need. Thus, upon remand, when the Board reviews whether Lewis County properly designated agricultural lands, the inquiry should include whether the county's decisions were "clearly erroneous" in light of the considerations outlined in RCW 36.70A.030 or WAC 365-190-050.

V
¶ 20 While most of the county's designation decisions at least possibly could have been based on permissible criteria,[14] we note one exception. In excluding "farm centers" and farm homes from designated agricultural lands,[15] the county sought "to serve the farmer's non-farm economic needs." Opening Br. at 30. Serving the farmer's "non-farm" economic needs is not a logical or permissible consideration in designating agricultural lands under the GMA. That is because it is a goal in and of itself, not a characteristic of farmland to be evaluated in determining whether such land has long-term commercial significance. A farmer's presumed need for "non-farm" income does not necessarily relate to soil, productivity or growing capacity under RCW 36.70A.030(10), nor to proximity to population areas or the possibility of more intense uses of land. It has to do only with the farmer's bottom line. And while we share Lewis County's concern for the struggles farmers often face, we note that the GMA is not intended to trap anyone in economic failure, as evidenced by the mandate to conserve only those farmlands with long-term commercial significance. The problem with the county's approach is that any farmer could convert any five acres of farmland to more profitable uses, even if such conversion would remove perfectly viable fields from production. Thus it was clearly erroneous for Lewis County to exclude from designated agricultural lands up to five acres on every farm, without regard to soil, productivity or other specified factors in each farm area.[16] Accordingly, we affirm the Board's *1105 invalidation of the blanket exclusion of five-acre farm centers and farm homes from designated agricultural lands.

VI
¶ 21 Having discussed whether Lewis County properly designated lands under RCW 36.70A.170, we now turn to the RCW 36.70A.060 duty to conserve designated lands. The GMA says in relevant part: "Each county . . . shall adopt development regulations . . . to assure the conservation of agricultural . . . lands designated under RCW 36.70A.170." RCW 36.70A.060(1).
A county . . . may use a variety of innovative zoning techniques in areas designated as agricultural lands . . . The . . . techniques should be designed to conserve agricultural lands and encourage the agricultural economy. A county . . . should encourage nonagricultural uses to be limited to lands with poor soils or otherwise not suitable for agricultural purposes.
RCW 36.70A.177(1) (emphasis added).
¶ 22 [T]echniques a county . . . may consider include . . .
(a) Agricultural zoning, which limits the density of development and restricts or prohibits nonfarm uses of agricultural land . . .
(b) Cluster zoning . . .
(c) Large lot zoning . . .
(d) []/quarter zoning . . .
(e) Sliding scale zoning . . . .
RCW 36.70A.177(2). Thus, counties may choose how best to conserve designated lands as long as their methods are "designed to conserve agricultural lands and encourage the agricultural economy." RCW 36.70A.177(1).
¶ 23 Lewis County contends that the Board ignored RCW 36.70A.177 and mandated that all agricultural land be zoned for agriculture only, thereby imposing a "per se prohibition" on all nonagricultural uses there. Opening Br. at 33. But as the respondent citizens correctly noted, the Board orders contain no such prohibition. Br. of Resp'ts at 24. Rather, the Board concluded that the non-farm uses allowed within farmlands, including mining, residential subdivisions, telecommunications towers and public facilities: (a) "are not limited in ways that would ensure that they do not impact resource lands and activities negatively," and (b) substantially interfere with achieving the GMA goal of maintaining and enhancing the agricultural industry. CP at 676. Furthermore, the Board found that the zoning failed to conserve agricultural land as required by RCW 36.70A.060. For example, the Board found that: (a) "[t]he failure to regulate farm housing to conserve agricultural prime soils and to prevent residential densities inconsistent with agriculture fails to conserve agricultural lands," (b) "[c]lustered residential subdivisions as currently allowed in the 13,767 acres of Class A Farmlands are not designed to ensure conservation of agricultural lands and encourage the agricultural economy," and (c) "the requirement that these uses not detract from the overall productivity of the resource activity is not sufficient protection." CP at 672. That is different from requiring a particular form of zoning or flatly prohibiting all non-farm uses. In sum, Lewis County has not been stripped of the ability to use innovative zoning techniques pursuant to RCW 36.70A.177, as it contends. Rather, in invalidating the Lewis County ordinance allowing non-farm uses of agricultural lands, the Board was simply making sure that the county's zoning methods are actually "designed to conserve agricultural lands and encourage the agricultural economy" as required by RCW 36.70A.177(1).[17]
*1106 ¶ 24 The county also argued that the Board failed to heed this court's decision in King County v. Central Puget Sound Growth Management Hearings Board, 142 Wash.2d 543, 14 P.3d 133 (2000), which involved whether soccer fields could be located on agricultural lands. Opening Br. at 31-32. The county contends that the Soccer Fields test is whether a nonagricultural use "unreasonably" prevents agricultural land "from being used for its intended purpose," or "defeat[s]" the county's ability to maintain and enhance the farm industry. Opening Br. at 32. That is not the test. This court said, "In order to constitute an innovative zoning technique consistent with the overall meaning of the Act, a development regulation must satisfy the Act's mandate to conserve agricultural lands for the maintenance and enhancement of the agricultural industry." Soccer Fields, 142 Wash.2d at 560, 14 P.3d 133. "After properly designating agricultural lands . . . the County may not then undermine the Act's agricultural conservation mandate by adopting `innovative' amendments that allow the conversion of entire parcels of prime agricultural soils to an unrelated use." Id. at 561, 14 P.3d 133. The court concluded that the soccer field zoning was noncompliant because it "would result in a long-term removal" of agricultural land from agricultural production, possibly never returning to agricultural use. Id. at 562, 14 P.3d 133. Thus, a zoning technique that allows non-farm uses on designated agricultural lands satisfies the Soccer Fields test if it does not undermine the GMA mandate to conserve agricultural lands for the maintenance and enhancement of the farm industry.
¶ 25 Applying the Soccer Fields test to this case, the question is whether Lewis County's ordinance allowing residential subdivisions and other non-farm uses within designated agricultural lands undermined the GMA conservation requirement. This is a question of law, and we give "substantial weight" to the Board's interpretation of the GMA. Id. at 553, 14 P.3d 133. In concluding that Lewis County's permitting of non-farm uses could "impact resource lands and activities negatively," and therefore substantially interferes with maintaining and enhancing the farm industry, the Board essentially interpreted the GMA to prohibit negative impacts on agricultural lands and activities. CP at 676. That is consistent with the RCW 36.70A.060 directive to conserve designated agricultural lands, the RCW 36.70A.020(8) goal of maintaining and enhancing the agricultural industry, and the Soccer Fields holding that innovative zoning may not undermine conservation. Therefore, the Board did not err in holding that the non-farm uses of agricultural lands failed to comply with the GMA requirement to conserve designated agricultural lands.

VII
¶ 26 In conclusion, as explained above, we reverse the Board's decision that Lewis County may not designate agricultural lands based on the local farm industry's projected land needs. If the State wants to conserve all land that is capable of being farmed without regard to its commercial viability, it may buy the land.
¶ 27 We also remand the case for the Board to apply the correct definition of agricultural land, taking into account whether the county used permissible criteria. However, we affirm the Board's invalidation of the exclusion of farm homes and farm centers from designated agricultural lands because "serving the farmer's non-farm economic needs" is not a permissible consideration. We also affirm the Board's invalidation of non-farm uses within agricultural lands.[18]
Concurring: C. JOHNSON, MADSEN, BRIDGE, OWENS, and FAIRHURST, JJ.
J.M. JOHNSON, J. (dissenting/concurring).
¶ 28 The legislature recognized the authority and wide discretion of county governments to adopt county comprehensive plans according to local growth patterns, resources, *1107 and needs. RCW 36.70A.010-902; Manke Lumber Co. v. Diehl, 91 Wash.App. 793, 796, 959 P.2d 1173 (1998). This is the necessary starting point when reviewing any Growth Management Act (GMA) case involving review of local legislative planning decisions by one of the Growth Management Hearings Boards (GMA Boards).[1]
¶ 29 The majority adequately recognizes this deference owed to county legislative bodies and the resulting standards of review. However, the majority disregards this principle when it upholds the GMA Board's decision to overturn Lewis County's (County) determination that farm centers and farm homes and certain other nonresource related uses are appropriate and allowable on agricultural and forest lands in the county. Therefore, I concur in part and dissent in part.

I. THE GROWTH MANAGEMENT ACT AND THE ROLE OF THE GMA BOARDS
¶ 30 Prior to reviewing these GMA Board decisions, it is necessary to provide a brief overview of the GMA, the creation of the three GMA Boards, the requirements for GMA Board membership, and the GMA Boards' limited role to ensure compliance with GMA, while giving local legislative bodies discretion to address local needs.
¶ 31 In 1991 the Washington State legislature passed the GMA to help preserve Washington's environmental quality and to balance the inevitable growth with the quality of life concerns for the benefit of Washington residents. See LAWS OF 1990, 1st Ex.Sess., ch. 17, codified at ch. 36.70A RCW. The GMA recognizes 13 planning goals, which are not ranked in priority, are not meant to be exclusive, and are permitted to be given varying degrees of emphasis by local legislative bodies. RCW 36.70A.020; WAC 365-195-070(1).
¶ 32 The GMA was to be a "bottom-up" approach, allowing local cities and counties the authority to make decisions based on their local needs in order to harmonize and balance the 13 statewide planning goals.[2]
¶ 33 GMA was not intended to be a top-down approach with state agencies (or GMA Boards) dictating requirements to local entities. Thus, in accordance with the legislative language of the act, we have held that the GMA does not prescribe a single approach to growth management. RCW 36.70A.3201; Viking Props. v. Holm, 155 Wash.2d 112, 125-26, 118 P.3d 322 (2005) ("`the ultimate burden and responsibility for planning, harmonizing the planning goals of [the GMA], and implementing a county's or city's future rests with that community.'" (alteration in original) (quoting RCW 36.70A.3201)).
¶ 34 Thus, the GMA is implemented exclusively by city and county governments and is to be construed with the flexibility to allow local governments to accommodate local needs. Viking Props., 155 Wash.2d at 125-26, 118 P.3d 322.
¶ 35 Rather than have GMA disputes proceed directly to superior court, the legislature created three regional GMA Boards to resolve land disputes under the GMAWestern Washington Growth Management Board, Eastern Washington Growth Management Board, and Central Puget Sound Growth Management Board. RCW 36.70A.250. In this case we are dealing with the Western Washington Growth Management Board (Board).
¶ 36 The role of GMA Boards is quasi-judicial and each may interpret for counties and cities the requirements of the GMA to ensure compliance with the GMA's 13 goals. *1108 GMA Boards are the first level to resolve conflicting interpretations in order to resolve land disputes quickly and efficiently. GMA Boards are empowered to "hear and determine" allegations that a city, county, or state agency has not complied with the goals and requirements of the GMA and related provisions of the Shoreline Management Act of 1971[3] and the State Environmental Policy Act.[4] RCW 36.70A.280.
¶ 37 GMA Boards review petitions for review regarding (1) designation of resource lands and critical areas, (2) regulations to conserve and protect critical areas, (3) designate urban growth boundaries, and (4) comprehensive plans, development regulations, and shoreline master plans. Each board may also review the 20-year growth management plans, determine issues of standing, and has the task of making adjustments to growth management planning projects while considering state-wide implications. RCW 36.70A.280.
¶ 38 However, the role of GMA Boards is very limited. The legislature requires each GMA Board "to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of" the GMA. RCW 36.70A.3201. While we give weight to each GMA Board's decisions, deference is required to county planning actions if consistent with the goals and requirements of the GMA. State v. Bradshaw, 152 Wash.2d 528, 535, 98 P.3d 1190 (2004), cert. denied, 544 U.S. 922, 125 S.Ct. 1662, 161 L.Ed.2d 480 (2005). Moreover, if a GMA Board fails to give deference to a county planning decision that complies with the GMA, the GMA Board's ruling is not entitled to deference from this court. Quadrant Corp. v. State Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 238, 110 P.3d 1132 (2005).
¶ 39 Some GMA Boards have recognized their very limited authority: that they are not allowed to reach constitutional or equitable issues nor are they empowered to resolve disputes related to impact fees (RCW 82.02.020). See e.g., Alberg v. King County, No. 95-3-0041, Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Final Dec. & Order 1109 (Wash. Sept. 13, 1995) (GMA Board can't reach constitutional or equitable issues); Master Builders Assoc. of Pierce County v. City of Bonney Lake, No XX-X-XXXX, Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Final Order (Wash. Jan. 12, 2006) (GMA Board does not have jurisdiction to decide issues related to impact fees imposed under chapter 82.02 RCW.).
¶ 40 While "substantial weight" is afforded to a GMA Board's interpretation of the GMA,[5] they are not judicial or legislative officers. The board members are not elected, but are appointed by the sitting governor for six-year terms (without legislative confirmation). In order to be eligible to participate on a GMA Board, the GMA simply requires of members (1) that at least one attorney and one former local elected official serve on each board, (2) that each board member reside within the region for which the GMA Board has jurisdiction and is qualified by "experience or training in matters pertaining to land use planning," and (3) that no more than two members may reside in the same county nor be from the same political party. RCW 36.70A.260.
¶ 41 In summary, in order to effectuate the true legislative intent of the GMA, local legislative bodies must be free to address local needs and concerns. Each GMA Board's limited quasi-judicial role is to ensure that the proper legislative bodies under the GMA are making the decisions mandated.

II. AGRICULTURAL LAND AND FARM CENTERS AND FARM HOMES
¶ 42 The majority properly ascertains the definition of agricultural land from the plain language of the GMA and our prior case law. See majority at 1101-02 (citing City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 959 P.2d 1091 (1998)). However, the majority and I differ as to the appropriate remedy. The majority *1109 would remand the issue to the Board and instruct them to apply the definition. Majority at 1103. This will further protract and delay while not allowing the appropriate local government to govern.[6]
¶ 43 I also would remand to the Board (as remand is procedurally necessary) but would instruct the Board to remand to Lewis County to allow the county and its legislative body to correct the designations of land given this new definition. Lewis County must be allowed to alter its plans, if it so desires.
¶ 44 The majority summarily affirms the Board's finding of noncompliance pertaining to farm homes and farm centers. See majority at 1105. Specifically, the Board found that the provisions allowing farm centers and farm homes failed to comply with the GMA requirements for designation of agricultural resource lands. Clerk's Papers (CP) at 31. I disagree. The farm centers and farm homes that Lewis County allowed are compatible with agricultural lands under the requirements of the GMA.
¶ 45 Lewis County allowed specific farm homes and farm centers to be excluded from the designation of long-term agricultural lands (and thus allowed in those areas):
Long-term commercially significant designations do not include (a) the "farm home" (a house currently on designated lands as the date of designation and a contiguous 5 acres, to be segregated by boundary line adjustment for separate financing purposes; and (2) "farm centers," being those lands existing at the time of designation, marked by impervious (gravel or paved) surfaces, including buildings and sheds and storage areas) not to exceed 5 acres, which shall be available for rural commercial and industrial uses under guidelines established as a conditional use. (Non-farm development on the farm center shall not be effective until the County completes the terms of the special use permit.)
Lewis County Ordinance 1179E, CP at 418 (emphasis added). These farm homes and farm centers were areas that had preexisting nonagricultural uses. Id. In adopting the above ordinance, Lewis County reasoned that "[t]he family home on the farm is not farmed and is often used for numerous activities that provide economic return to the farm family other than farm agriculture." CP at 255. Regarding farm centers, such as roadside stands for sale of farm products, Lewis County reasoned that "[f]arms in Lewis County have areas developed by paved or gravel level areas, barns, sheds, storage facilities, equipment and machine storage and maintenance areas . . . [s]uch areas support the farm activity, but are not cropped, tilled, or generally used for soil-based agriculture, nor are they likely to in the future." CP at 255. Moreover, the farm centers were to be "centered around the existing barn and shed facilities." CP at 255.
¶ 46 The purpose of farm homes and farm centers was to ensure the long-term survival of agricultural land by allowing farmers to supplement their income. "[M]ost farms are not economically self sufficient . . . `on farm non farm income' and the ability of the farm to provide non farm economic opportunities are both essential to the survival of long-term agriculture in Lewis County." CP at 254-55; 853. This income is a substantial component of financial viability for farms in Lewis County.
¶ 47 Such farm centers were often already developed on lands in which the soil was not used for agriculture. A farm house and contiguous land was limited to five acres. Lewis County's Opening Br. at 30. Thus, these farm centers and farm homes have a minimal effect on agricultural land. Lewis County notes that
The designation of the farm home and the farm center from long-term commercially significant lands will not have a major impact on the conservation and protection of long-term commercially significant agricultural lands because

*1110 a. Such lands are commonly not in production; and
b. The land removed from the total designation is estimated to be approximately 2,000 acres, still leaving ample reserve for current agricultural production and future growth."
CP at 255-56. Moreover, home occupations and small commercial activities have previously coexisted with and supported farms and there is no evidence that such coexistence harmed the long term commercial significance of agricultural land. See CP at 857.
¶ 48 The majority states that "[s]erving the farmer's . . . economic needs is not a . . . permissible consideration under the GMA." Majority at 1104. This is illogical and would lead to fewer farms. As a legal conclusion, it is wrong; the GMA does not prohibit consideration of farmer's economic needs.
¶ 49 The majority reads RCW 36.70A.030(10) as an exclusive list of what "long-term commercial significance" means. Majority at 1102. However, the plain language of the statute shows that the list is not exclusive: "`[l]ong-term commercial significance' includes the growing capacity, productivity, and soil composition of the land for long-term commercial production." RCW 36.70A.030(10) (emphasis added). Thus, counties may consider other factors in determining whether land has "long-term commercial significance," including the farmers' economic needs. Moreover, as the planning commission recognized, "most farms are not economically self sufficient, and that `on farm non farm income' and the ability of the farm to provide non farm economic opportunities are both essential to the survival of long-term agriculture in Lewis County." CP at 254-55. Allowing farm centers actually furthers the goals of the GMA because farmers will continue to farm because they are able to ensure a profit by supplementing their income through sales, etc.
¶ 50 Farm centers and farm homes are compatible with the requirements of the GMA and may be necessary to perpetuate farms, as the Lewis County elected officials decided after extended and public consideration.

III. NON-RESOURCE USES
¶ 51 The GMA directs counties to do management and planning but allows county government broad discretion to decide what is best for each county. This discretion is especially important when considering non-resource uses on forest and agricultural land.
¶ 52 RCW 36.70A.060, the development regulations for natural resource lands and critical areas, uses mandatory language and thus imposes a requirement. RCW 36.70A.060(1) provides:
Each county . . . shall adopt development regulations on or before September 1, 1991, to assure the conservation of agricultural, forest, and mineral resource lands designated under RCW 36.70A.170. Regulations adopted under this subsection may not prohibit uses legally existing on any parcel prior to their adoption and shall remain in effect until the county or city adopts development regulations pursuant to RCW 36.70A.040. Such regulations shall assure that the use of lands adjacent to agricultural, forest, or mineral resource lands shall not interfere with the continued use, in the accustomed manner and in accordance with best management practices, of these designated lands for the production of food, agricultural products, or timber, or for the extraction of minerals.
(Emphasis added).
¶ 53 This court interpreted this statute in the "Soccer Fields" case stating: "The County is to conserve agricultural land in order to maintain and enhance the agricultural industry and to discourage incompatible uses." King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 557, 14 P.3d 133 (2000) (emphasis omitted) (hereinafter Soccer Fields).
¶ 54 RCW 36.70A.177(1), allowing innovative zoning techniques, uses discretionary language, which indicates a recommendation not a requirement:
A county or a city may use a variety of innovative zoning techniques in areas designated as agricultural lands of long-term commercial significance under RCW 36.70A.170. The innovative zoning techniques *1111 should be designed to conserve agricultural lands and encourage the agricultural economy. A county or city should encourage nonagricultural uses to be limited to lands with poor soils or otherwise not suitable for agricultural purposes.
(Emphasis added). The explicit purpose of this statute is to allow counties to apply creative alternatives that conserve agricultural lands and maintain and enhance the agricultural industry. Soccer Fields, 142 Wash.2d at 561, 14 P.3d 133.
¶ 55 The majority reads these two statutes together to mean that "counties may choose how best to conserve designated lands as long as their methods are `designed to conserve agricultural lands and encourage the agricultural economy.'" Majority at 1105. Thus, Lewis County has discretion in its land designations, but should aim to conserve agricultural lands and encourage the agricultural economy. This is the standard we use when reviewing a board's determination of noncompliance and invalidity regarding non-resource uses.
¶ 56 The majority states:
[T]he Board essentially interpreted the GMA to prohibit negative impacts on agricultural lands. CP at 676. That is consistent with the RCW 36.70A.060 directive to conserve designated agricultural lands, the RCW 36.70A.020(8) goal of maintaining and enhancing the agricultural industry, and the Soccer Fields holding that innovative zoning may not undermine conservation.
Majority at 1106. However, the Board did not specify any negative impact Lewis County's non-resource uses had on agricultural land. Thus, the Board failed to adequately consider the uses and did not support its findings with evidence. The Board decision did not further the goal of maintaining and enhancing the agricultural industry and may actually undermine farm survival. As discussed above, the many small farms composing "agricultural industry" often need supplemental income to survive. Finally, the Soccer Fields case is easily distinguished. In that case entire parcels of agricultural land were being converted to long-term and nonagricultural uses of recreational fields. Here only a small and specified portion of some agricultural land parcels are being used in each instance (cumulatively little).
¶ 57 The uses that the Board found noncompliant are actually consistent with the GMA when given proper consideration (as Lewis County did here).

A. Lewis County Code (LCC) 17.30.470(2)(c) and (d): Forest Land Incidental Uses

¶ 58 LCC 17.30.470 allows incidental uses on forest land, which may provide supplementary income, "without detracting from the overall productivity of the forestry activity." (Emphasis added). The uses must not "adversely affect the overall productivity of the forest nor affect more than five percent of the prime soils[7] . . . on any forest resource lands;" the use must be "secondary to the principal activity of forestry;" and the use must be "sited to avoid prime lands where feasible and otherwise to minimize impact on forest lands of long-term commercial significance. LCC 17.30.470(1); Attach. III (Lewis County's Am. Opening Br.) at 178-79 (Attach.III).
¶ 59 The Board declared several subsections of LCC 17.30.470 as noncompliant and invalid: (2)(c), allowing telecommunication facilities as an incidental activity, and (2)(d), allowing the "erection, construction, alteration, and maintenance of gas, electric, water, or communication and public utility facilities." Attach. III at 179; CP at 46. The Board reasoned that the restrictions on the incidental uses did not fulfill the GMA requirement that natural resource lands be conserved and incompatible uses discouraged. CP at 46.
*1112 ¶ 60 Lewis County had reasoned that these incidental uses are necessary because the county's residential corridors are surrounded by forest lands, any cross county public utility will necessarily cross either forest or agricultural lands. CP at 866. Moreover, most of the prominent hills in the county are located in forest land, thus any desire to run communication lines or towers on tall hills will require that they be located in forest lands. CP at 866.
¶ 61 Considering the protective limits Lewis County placed on the minimally intrusive incidental uses, as well as the necessity of those uses and their importance to the agricultural economy, the uses meet the GMA's directive to conserve agricultural lands and encourage the agricultural economy. The uses comply with the GMA and are well within Lewis County's discretion under the GMA.

B. LCC 17.30.480: Essential Public Facilities (forest land)

¶ 62 LCC 17.30.480 provides:
Essential public or regulated facilities, such as roads, bridges, pipelines, utility facilities, schools, shops, prisons, and airports are facilities, which by their nature are commonly located outside of urban areas and may need large areas of accessible land. Such areas are allowed where:
(1) Identified in the comprehensive plan of a public agency or regulated utility.
(2) The potential impact on forestry lands and steps to minimize impacts to commercial forestry are specifically considered in the siting process.
In deciding that this section was both noncompliant and invalid, the Board admitted that:
There are essential public facilities such as roads, bridges, pipelines and utility lines that must, of necessity, be located in resource lands. Clearly, the County must take into account the need for the construction of such facilities in resource lands. However, the County must also assure that the construction of these essential public facilities in forest resource lands does not interfere with the use of the resource.
CP at 47. Lewis County notes that one-third of the county is in designated forest lands. CP at 871. Thus, essential public facilities including roads, bridges, pipelines, and utility lines must be located in resource lands.
¶ 63 This section of Lewis County's code is compliant and valid because the County has appropriately balanced the requirement for essential public facilities with conservation of forest land. The evidence supporting this appropriate balance includes the admitted fact that forest land encompasses a large percentage of Lewis County, and the requirements of section 480 that uses must be identified in the comprehensive plan. The impact of each use on the forest land is considered and minimized in the siting process. The legislature required the counties to receive deference in making such decisions.

C. LCC 17.30.490(3)(b) and (g): Maximum Density and Minimum Lot Area (forest land)

¶ 64 LCC 17.30.490(3) provides:
Subdivision as an Incidental Use. A residential subdivision of land for sale or lease within primary or local forest lands, whether lots are over or under five acres in size, may be approved under the following circumstances.
(a) The total density, including existing dwellings, is not greater than one unit per 80 acres, for forest land of long-term commercial importance, and that one unit per 20 acres for forest lands of local importance.
(b) The units are clustered on lot sizes consistent with Lewis County board of health rules for wells and septic.
(c) Adequate water and provisions for septic are in fact present.
(d) The project affects none of the prime soils on the contiguous holdings at the time of the adoption of this chapter, including all roads and accessory uses to serve the development; however, that prime lands previously converted to non-forestry *1113 uses are not considered prime forest lands for purposes of this section.
(e) The plat shall set aside the balance of the parcel in a designated forest tract.
(f) The plat shall contain the covenants in LCC 17.30.540.
(g) Any subdivision shall meet the cluster subdivision requirements of LCC 17.115.030(10)[8]
¶ 65 The Board found subsections (b) and (g) noncompliant and invalid. CP at 48. The Board stated that "[l]imitations on clustering are needed to ensure that residential subdivisions will not interfere with forestry activities." CP at 46. However, the section contains many limitations designed to protect forest activitiesno prime soils may be affected, water provisions must be in place, and clustering restrictions contained in LCC 17.115.030(10). These limitations are sufficient to fulfill the GMA requirement of conserving forest land. Thus, the challenged sections are compliant and valid.

D. LCC 17.30.510: Water Supply

(1) When residential dwellings, other structures, or any other use intended to be supplied with water from off-site sources, an easement and right running with the land shall be recorded from the property owners supplying the water prior to final plat approval, building permit issuance, or regulated use approval.
(2) Due to the potential to interfere or disrupt forest practices on forest lands, new residential or recreational public water supplies shall comply with state standards and shall not be located within 100 feet of classified forest lands without an easement from the adjacent or abutting forest land property owner.
¶ 66 The Board found LLC 17.30.510 to be in violation of the GMA, RCW 36.70A.110 (4), 36.70A.060[9] and 36.70A.040. CP at 49. The Board based its conclusion on chapter 36.70A RCW claiming the provision "runs afoul of the GMA prohibition against providing urban governmental services outside of urban growth areas." CP at 48. The Board stated
The extension of water systems (whether owned privately or publicly) to natural resource lands for residential purposes clearly violates the GMA by encouraging intense levels of development in resource lands and encouraging nonresource-related uses of those lands.
CP at 48.
¶ 67 The Board's conclusion ignores the GMA's balancing of the 13 planning goals and fails to implement the GMA's clear mandate that cities and counties are to make planning decisionsnot boards.
¶ 68 To properly apply chapter 36.70A RCW, we must be guided by legislative intent as expressed in the language of the GMA. Dep't of Licensing v. Cannon, 147 Wash.2d 41, 57, 50 P.3d 627 (2002); Rozner v. City of Bellevue, 116 Wash.2d 342, 347, 804 P.2d 24 (1991). All of the GMA provisions must be considered in their relation to one another, and if possible, harmonized to ensure *1114 proper construction of each provision. City of Seattle v. Fontanilla, 128 Wash.2d 492, 498, 909 P.2d 1294 (1996).
¶ 69 The Board's decision implies that extension of water systems to natural resource lands for residential purposes may never occur. This is not consistent with the GMA. There are 13 planning goals that must be balanced and harmonized with others. This balancing and harmonizing is within the discretion of the cities and counties. See Manke Lumber, 113 Wash.App. at 626-27, 53 P.3d 1011. The protection of natural resources and critical areas is just one of the 13 planning goals under the GMA. The other planning goals require, inter alia, cities and counties to balance economic development needs, private property needs, and environmental needs. The blanket ban on extension of water systems to natural resource lands renders RCW 36.70A.110(4), 36.70A.040, and 36.70A.060 inconsistent with the GMA's harmonizing approach and inconsistent with the discretion given to local cities and counties to balance those goals.

E. LCC 17.30.620(3) and (4): Primary Uses

¶ 70 LCC 17.30.620(3) and (4) allowed several "primary uses" on agricultural land including:
(3) One-single family dwelling unit or mobile home per lot, parcel, or tract, and the following farm housing:
(a) Farm employee housing; or
(b) Farm housing for immediate family members.
(4) Active mineral resource activities, including mining, processing, storage, and sales.
LCC 17.30.620(3), (4). The Board held these uses noncompliant and invalid. CP at 38-39.
¶ 71 Regarding section (3), housing, the Board inconsistently acknowledged that "[f]arm worker housing and housing for immediate family members . . . may well be a resource-related use." CP at 38. The record here supports the necessity to encourage young members of families to stay on the farm. CP at 877. Further, farm worker housing is a resource related use that maintains and enhances the agricultural industry. Section (3) is an allowable use under the GMA.
¶ 72 Regarding section (4), mining, the Board held that the provision does not comply with the GMA to the extent mining activities are allowed without restriction in agricultural resource lands. CP at 37. The Board noted that mining activities are nonagricultural uses with great potential to impact agricultural activities and the lands themselves. CP at 38.
¶ 73 Lewis County argued that mining (presumably sand and gravel) is allowed to provide on-farm non-farm income. CP at 877.
¶ 74 The Board erroneously held that allowing any such mining in agricultural areas would not comply with the GMA. It is likely that mining (as further defined) could be allowed in an agricultural area with the appropriate restrictions. However, such use may be better included in the incidental uses section discussed directly below.

F. LCC 17.30.640(2)(b)(c) and (e)

¶ 75 LCC 17.30.640, Incidental uses, provides for "[u]ses which may provide supplementary income without detracting from the overall productivity of the farming activity." (Emphasis added). The Board found subsections (2)(b), (c), and (e) noncompliant. CP at 42. LCC 17.30.640(2) (Ord.1170B, 2000) provides:
(2) Uses Allowed as Incidental Activities.
. . . .
(b) Telecommunication facilities;
(c) Public and semipublic buildings, structures, and uses including, but not limited to, fire stations, utility substations, pump stations, wells, and transmission lines;
. . . .
(e) Home based business subject to the same size requirements, development conditions, and procedures and processes as home based businesses authorized under LCC 17.42.40[.]
¶ 76 Subsection (1) qualifies these allowed uses by stating that such uses "will not adversely *1115 affect the overall productivity of the farm nor affect any of the prime soils on any farm." LCC 17.30.640(1)(a). The code itself states that uses may not detract from the overall farming activity and that such uses will not affect any of the prime soils. Lewis County has properly qualified the non-farm incidental uses in its code. Thus, the County requirements for a non-farm use assure the conservation of agricultural lands as required by RCW 36.70A.060.

G. LCC 17.30.650: Essential Public Facilities (agricultural land)

¶ 77 This section is similar to the requirements in LCC 17.30.480, discussed above. LCC 17.30.650 provides:
Essential public or regulated facilities, such as roads, bridges, pipelines, utility facilities, schools, shops, prisons, and airports, are facilities, which by their nature are commonly located outside of urban areas and may need large areas of accessible land. Such areas are allowed where:
(1) Identified in the comprehensive plan of a public agency or regulated utility.
(2) The potential impact on farmed lands and steps to minimize impacts to commercial agriculture are specifically considered in the siting process.
The Board concluded that this section was noncompliant and invalid. CP at 43. Regarding roads, bridges, pipelines, and utility lines, the Board found noncompliance because there were no restrictions ensuring minimal interference with agricultural activity. CP at 43. However, the Board overlooked the restrictions which are written into the statute; the public facilities must be identified in the comprehensive plan and the impact on the lands must be considered and minimized when determining the location of such facilities.
¶ 78 Regarding schools, shops, prisons, and airports, the Board found noncompliance because the uses interfere with agricultural uses and do not need to be placed on agricultural land. CP at 43. It is appropriate that Lewis County consider the need for such facilities on agricultural land. An example of such a need would be allowing some schools to be sited in agricultural areas to shorten student commutes.

H. LCC 17.30.660(1):Maximum Density and Minimum Lot Area (agricultural land)

¶ 79 This section is similar to the requirements in LCC 17.30.490(3), discussed above. LCC 17.30.660(1) provides:
The minimum lot area for any new subdivision, short subdivision, large lot subdivision or exempt segregation of property shall be as follows, except for parcels to be used for uses and activities provided under LCC 17.30.610 through 17.30.650:
(1) Development StandardsDivision of Land for Sale or Lease. The minimum lot area for subdivision of commercial farmland shall be 20 acres; provided, however, that a residential subdivision of land for sale or lease, whether lots are over or under five acres in size, may be approved under the following circumstances:
(a) The total density of residential development on the entire contiguous ownership, including existing dwellings, is not more than one unit per 20 acres.
(b) The units are clustered on lot sizes consistent with Lewis County board of health rules for wells and septic.
(c) Adequate water and provisions [for] septic capacity are in fact present.
(d) The project affects none of the prime soils on the contiguous holdings at the time of the adoption of the ordinance codified in this chapter, including all roads and accessory uses to serve the development; provided, however, that prime lands previously converted to non-crop related agricultural uses, including residential, farm and shop buildings and associated yards, parking and staging areas, drives and roads, are not considered prime farm lands for purposes of this section.
(e) The plat shall set aside the balance of the prime farm lands in a designated agricultural tract.
(f) The plat shall contain the covenants and protections in LCC 17.30.680.

*1116 (g) Any subdivision shall meet the cluster subdivision requirements of LCC 17.115.030(10).
¶ 80 The Board found subsections (b) and (g) noncompliant and invalid. CP at 56. The Board expressed concern that clustering would not conserve agricultural lands and encourage the agricultural economy. CP at 44. However, the section contains many limitations designed to protect agricultural activities  no prime soils may be affected, water provisions must be in place, and clustering restrictions are contained in LCC 17.115.030(10). These limitations are sufficient to fulfill the GMA's requirement of conserving agricultural land. Thus, the challenged sections are compliant and valid.

IV. CONCLUSION
¶ 81 I concur with the majority's conclusion regarding the definition of agricultural land. However, the majority incorrectly proceeds to allow the Boardinstead of the Countyto decide that farm centers and farm homes are improper on agricultural land and that certain non-resource related uses are improper on agricultural and forest lands. By remanding to the Board instead of through the Board to the County to apply the decision, the local control mandated by the legislature in the GMA is further frustrated. The proceedings and resulting delay imposes costs easily avoided by my recognition of the legislature's intent. Therefore, I concur in part and dissent in part.
SANDERS and CHAMBERS, JJ., concur.
[DOCNUM 0129005A]
NOTES
[1] We disagree with the dissent's assertion that this court should "instruct the Board to remand to Lewis County to allow the county and its legislative body to correct the designations of land given this new definition." Dissent at 1109. First of all, we are not establishing a "new definition." The legislature defined agricultural land when it adopted RCW 36.70A.030(2). We are simply interpreting that definition, using traditional tools of statutory construction in order to resolve the present dispute over what the legislature meant in adopting RCW 36.70A.030(2). Secondly, the GMA already requires the Board to remand to the county any regulation or plan that is determined to be noncompliant. RCW 36.70A.300(3). Therefore, to the extent that Lewis County's designation of 54,400 acres of agricultural land turns out to be off the mark, the GMA already ensures that the county will decide how to correct that problem. In that sense, we do not disagree with the dissent. Besides, because we affirm the Board's other findings of noncompliance, Lewis County already will have to reconsider its approach to conserving designated lands. Finally, although we conclude that both the Board and Lewis County misinterpreted the definition of agricultural land in RCW 36.70A.030(2), that does not necessarily mean that Lewis County designated the wrong parcels (or too few of them). The extent to which the designated parcels match the actual definition of agricultural land is a compliance question, and therefore is properly directed to the Board, the agency charged with determining GMA compliance. RCW 36.70A.320(3). It seems that the dissent would bypass the Board and allow counties to decide whether their own actions comply with the GMA. For example, the dissent complains that these "unelected boards" may "micromanage land use plans for counties." Dissent at 1107 n.1. While bypassing the Board certainly would promote the dissent's goal of "allowing the . . . local government to govern" it would contradict the intent of the legislature for a quasi-judicial body to evaluate GMA compliance. Dissent at 1109.
[2] Planning Commissioners ultimately recommended conserving 2,800 acres fewer than the county staff had recommended.
[3] One condition was to "not adversely affect the overall productivity of the farm nor affect any of the prime soils on any farm." CP at 381.
[4] Petitioners included Vince Panesko, Eugene Butler, and 14 other respondents in this case.
[5] The Board found that only 5,765 of the 117,767 acres being farmed in Lewis County as of 1997 were irrigated.
[6] The reconsideration order also reversed the Board's invalidation of maps designating Class A and Class B farmlands, finding that those lands were adequately protected pending full compliance. But the order upheld the invalidation of maps designating "Class C" farmlands in rural zonesciting concerns that land with prime soils or recent farming activity could be lost to non-farm development in the absence of agricultural zoning.
[7] The dissent wrongly summarizes the Board's role as merely this: "to ensure that the proper legislative bodies under the GMA are making the decisions mandated," as if any decisions will do. Dissent at 1108. Actually, the Board is empowered to determine whether county decisions comply with GMA requirements, to remand noncompliant ordinances to counties, and even to invalidate part or all of a comprehensive plan or development regulation until it is brought into compliance. RCW 36.70A.300(3), .320(3), .302(1). In other words, the Board is more than a deskbook dayminder telling counties what decisions are due.
[8] Lewis County became subject to GMA planning mandates in July 1993 and first designated agricultural lands in 1996. Until 1996, the county had no zoning laws at all.
[9] The issue in Benaroya I was whether a landowner must intend for the land to be "devoted to" agriculture to be subject to designation. We said, "While the land use on the particular parcel and the owner's intended use for the land may be considered along with other factors in the determination of whether a parcel is in an area primarily devoted to commercial agricultural production, neither current use nor landowner intent of a particular parcel is conclusive for purposes of this element of the statutory definition." Benaroya I, 136 Wash.2d at 53, 959 P.2d 1091.
[10] The decision refers to WAC 365-190-060 but cites language identical to the current WAC 365-190-050.
[11] Interestingly, while the State of Washington's amicus brief argues that the "structure" of WAC 365-190-050 supports the primacy of soil characteristics, it does not mention the extensive text devoted to these development-related considerations that have nothing to do with soil. State's Amicus Curiae Br. at 10. Besides, the regulation's structure merely mirrors the order in which the underlying statute, RCW 36.70A.030(10), lists the factors to consider in determining long-term commercial significance. Neither the statute nor the regulation purports to prioritize those factors.
[12] Rather than focusing on the mandates of RCW 36.70A.060 and .170 to designate and conserve agricultural lands as defined in RCW 36.70A.030, the county's opening brief, reply brief, and its answer to the amicus brief of Futurewise inexplicably dwell on GMA "planning goals," which merely offer guidance. See RCW 36.70A.020 ("The following goals are adopted to guide the development and adoption of comprehensive plans and development regulations. . . ." (emphasis added)). The county's line of argument is misguided. Quadrant Corporation v. Central Puget Sound Growth Management Hearings Board held that when there is a conflict between the "general" planning goals and more specific requirements of the GMA, "the specific requirements control." Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 119 Wash.App. 562, 575, 81 P.3d 918 (2003), rev'd in part on other grounds, 154 Wash.2d 224, 110 P.3d 1132 (2005); see also Quadrant Corp., 154 Wash.2d at 246, 110 P.3d 1132 (2005) (this court "did not rely on the applicable goal in isolation nor did it hold the goals to independently create substantive requirements"). Thus, the county is mistaken in its apparent belief that the general goal in RCW 36.70A.020(8) is the test for defining agricultural lands.
[13] For example, the county said it considered growing capacity and productivity by requiring agricultural land to have certain soil types, as well as sufficient irrigation capability "to grow the primary agricultural crops produced in Lewis County." CP at 378. The county considered predominant parcel size by requiring agricultural land to be at least 20 acres (for economic viability), or to meet the United States Department of Agriculture definition of "commercial" agriculture. The county considered availability of public facilities and services by requiring agricultural lands to be located outside areas where urban-level services are "conducive to the conversion" of farmland. Id. at 379, 110 P.3d 1132.
[14] For example, in finding that farms need gross sales of $25,000 or more for potential long-term significance, the county could have been considering "productivity" of the land or the "possibility of more intense uses" pursuant to RCW 36.70A.030(10). It is not necessarily error to assume that farms with meager income are likely to succumb to development pressures. Similarly, in finding that farms smaller than 180 acres may not be cost effective, the county could have been considering productivity, the possibility of more intense uses, or "predominant parcel size."
[15] While the county's briefs discuss this issue in the context of zoning choices, the Board correctly treated it as a designation issue. The Board found that excluding farm homes and farm centers from designated agricultural land was "clearly erroneous" because it "creates isolated pockets of inconsistent zoning in farmlands" and makes adjacent lands vulnerable to de-designation. CP at 649, 675.
[16] The dissent suggests that a county may designate agricultural land based on a farmer's economic needs or, for that matter, any other factors it deems worthy. Indeed, the dissent repeatedly invokes "discretion" as a mantra, as if the GMA places no bounds on county decisions. Dissent at 1106, 1107, 1110, 1111, 1112, 1114. For example, in defending Lewis County's decision to allow mining, residential subdivisions and other non-farm uses within designated farmlands, the dissent merely recites Lewis County's arguments without reference to the applicable GMA language. But the GMA says that Board deference to county decisions extends only as far as such decisions comply with GMA goals and requirements. RCW 36.70A.3201. In other words, there are bounds. Furthermore, although we agree with the dissent that counties may consider factors besides those specifically enumerated in RCW 36.70A.030(10) in evaluating whether agricultural land has long-term commercial significance, that is not what happened here. Rather, Lewis County simply decided to serve its own goal, serving the farmer's non-farm economic needs, instead of meeting the GMA's specific land designation requirements.
[17] The dissent appears to misperceive the scope of that RCW 36.70A.177 requirement for zoning methods to be "designed to conserve agricultural lands and encourage the agricultural economy." That is simply the standard that a county must meet if it uses an innovative zoning technique to conserve agricultural lands. Confusingly, the dissent asserts that it is also "the standard we use when reviewing a board's determination of noncompliance and invalidity regarding non-resource uses." Dissent at 1111. But the standard of review for Board determinations of noncompliance, as already noted, is drawn from the APA. Rather than apply the APA standard of review, the dissent simply offers bare assertions, i.e., "The uses that the Board found noncompliant are actually consistent with the GMA" to justify its conclusion that the Board erred. Dissent at 1111.
[18] Because we decide this case on statutory grounds we do not reach the procedural issues raised by Lewis County.
[1] A separate concern, of constitutional dimension, is not presented today; whether these sui generis unelected boards, appointed by the governor, may overrule county legislators and micromanage land use plans for counties.
[2] RCW 36.70A.020 lists the goals as:

1. Urban growth
2. Reduce sprawl
3. Transportation
4. Housing
5. Economic development
6. Property rights
7. Permits
8. Natural resource industries
9. Open space and recreation
10. Environment
11. Citizen participation and coordination
12. Public facilities and services
13. Historic preservation.
[3] Ch. 90.58 RCW.
[4] Ch. 43.21C RCW.
[5] King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 553, 14 P.3d 133 (2000).
[6] Notably, Lewis County has apparently been under constant review of the Board since 2000 as the Board found Lewis County noncompliant in 2000, 2001, and 2002. Pursuant to RCW 36.70A.130(4)(b) the Board is to review Lewis County's comprehensive plan every seven years. Thus, by the time this opinion issues, Lewis County will be on the cusp of yet another review and they have not fully completed this review.
[7] The omitted language of the quote provides "(15 percent as provided below in LCC 17.30.490(3))". Attach. III (Lewis County's Am. Opening Br.) at 178 (Attach.III). A notation next to the quote provides "errorsee strike out at 17.30.490(3)(d)." 17.30.490(3)(d) strikes out the words "15 percent or less". Attach. III at 180. The County states that the 15 percent clause was erroneously left in the subsection and should have been struck out. We assume that the County means what it says and has corrected this error.
[8] LCC 17.115.030(10) provides:

CLUSTER SUBDIVISIONS greater than six units.
(a) Special conditions.
(i) Must be on properties 40 acres and larger.
(ii) No more than 24 cluster subdivision units in any 1/2-mile radius, except where separated by a visual geographic barrier.
(iii) The hearing examiner shall examine the existing and proposed development within a one-mile radius of the perimeter of the proposed site to protect rural character and shall:
(A) Determine the nature of existing development and availability of adequate facilities.
(B) Determine the likelihood of probably future cluster development.
(C) Determine the cumulative effect of such existing and probable future development.
(iv) The hearing examiner shall make written findings that the area in which the cluster is located is within the population targets of Table 4.3, p. 4-63 of the Lewis County comprehensive plan.
(v) The hearing examiner shall identify necessary conditions, including caps or specific limitations to assure that urban development defined in RCW 36.70A.030(17) as prohibited outside urban growth areas by RCW 36.70A.110 does not occur, and that the rural character identified in the comprehensive plan and RCW 36.70A.030(16) and RCW 36.70A.070(5)(b) is protected, and to achieve the specific requirements of RCW 36.70A.070(5)(c).
[9] Natural resource lands and critical areas-Development regulations.