IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| COMMON SENSE ALLIANCE,<br>P.J. TAGGARES COMPANY, and<br>FRIENDS OF THE SAN JUANS, | )<br>)<br>)<br>) | No. 72235-2-I<br>(consolidated w/72236-1-I) |
| Appellants, | )<br>) | DIVISION ONE |
| v. | )<br>) | |
| GROWTH MANAGEMENT HEARINGS<br>BOARD, WESTERN WASHINGTON<br>REGION, | )<br>)<br>) | UNPUBLISHED OPINION |
| Defendant, | )<br>)<br>) | FILED: August 10, 2015 |
| and | )<br>) | |
| SAN JUAN COUNTY, | )<br>)<br>) | |
| Respondent. | ) | |

BECKER, J.—This opinion affirms a superior court decision rejecting

challenges to San Juan County's critical area ordinances.

The Growth Management Act, chapter 36.70A RCW, directs local

governments to designate "critical areas" and adopt development regulations to

protect them. RCW 36.70A.130(1). "Critical areas" include wetlands, areas that

feed aquifers used for potable water, fish and wildlife habitat conservation areas,

floodplains, and geologically hazardous areas. RCW 36.70A.030(5).

San Juan County began updating its critical areas ordinances in 2006. In 2012 the county enacted the four ordinances at issue in this appeal.

A number of people and entities, including the parties in this appeal, filed petitions for review of the ordinances with the Western Washington Growth Management Hearings Board. Appellant Friends of the San Juans raised 52 issues for review by the Board, generally contending that the ordinances did not go far enough to meet the Act's requirement that local governments protect critical areas. Appellants Common Sense Alliance and P.J. Taggares Company (collectively "the Alliance") together raised 27 issues for review, generally contending that the ordinances went too far to protect critical areas. The Board heard oral argument from June 24 to 26, 2013, in Friday Harbor. The Board found in favor of the parties on some issues and affirmed on others.

On October 2, 2013, the Alliance filed a petition for review of the Board's decision in San Juan County Superior Court, raising six issues. Friends filed its petition the next day, raising seven issues. In a thorough memorandum, the superior court upheld the Board's decision on each issue raised.

The Alliance and Friends have both appealed from the decision of the superior court. The two appeals have been consolidated. The first four issues to be addressed were raised by the Alliance. The remaining issues were raised by Friends.

ALLIANCE APPEAL

### *First Issue: Nexus & proportionality*

The Alliance mounts a facial challenge to the critical areas ordinances adopted by the County. The Alliance argues that the ordinances are fatally flawed because they do not provide for site-specific considerations of nexus, proportionality, and reasonable necessity before a critical area buffer may be imposed upon a project under review.

The County adopted four critical areas ordinances: San Juan County Ordinance 26-2012 (General), Ordinance 27-2012 (Geologically Hazardous Areas and Frequently Flooded Areas), Ordinance 28-2012 (Wetlands), and Ordinance 29-2012 (Fish & Wildlife Habitat Conservation Areas). The arguments in this case focus primarily on the habitat conservation ordinance.

The habitat ordinance lists "types of fish and wildlife habitat conservation areas." Ordinance 29-2012 at 9. These include areas with which endangered, threatened, and sensitive species common to the San Juans have a primary association; shellfish areas; nature preserves; and habitats of local importance. Ordinance 29-2012 at 9-11. While recognizing that maps exist showing the approximate location of habitat critical areas, the ordinance states that such maps are "only a guide to the possible location of these critical areas, and conditions in the field control." Ordinance 29-2012 at 12. Accordingly, the ordinance does not specifically identify each habitat conservation area and map out its boundaries. Rather, it states that all development activities requiring a

permit "must have a final inspection to verify compliance with approved plans and the requirements of this section." Ordinance 29-2012 at 13.

The ordinance lays out specific protection standards—including a "site-specific procedure for sizing buffers and tree protection zones." Ordinance 29-2012 at 16 Figure 3.2. The site-specific procedure takes into account the proposed land use intensity in addition to the type of water body. Ordinance 29-2012 at 16.

The Alliance contends that notwithstanding the site-specific procedure, the habitat buffers are designed to be imposed automatically on a one-size-fits-all basis. The Alliance argues that the ordinances must be reworked to provide flexibility so that the size of buffers can be modified according to the actual impact that a proposed project is expected to have on a critical habitat.

> There is no provision for the Department to modify or eliminate the required buffer based on the nature impact (or lack thereof) of the project undertaken, the needs of the critical area to be protected, or the benefit the required buffer may provide to the habitat giving rise to the condition. The water quality buffer is to be imposed regardless of whether or not (I) the proposed development increases, decreases, or makes no change to the water quantity discharged to the shoreline, or (2) the buffer is "reasonably necessary" to achieve "no net loss" of habitat function and value as provided by RCW 36.70A.480(4).
>
> If the proposed development on a property is within 200 feet from an area containing listed habitat, any tree on that property within 110 feet of the shoreline is subject to the tree protection requirements, regardless of whether or not (1) the tree on surrounding area is modified (2) the development increases, decreases, or has no effect on the functionality of the tree for environmental purposes, or (3) the tree in that location is considered a benefit to the habitat to be protected.
>
> Once a listed habitat is identified within 200 feet, the ordinance as written eschews any notion of project related nexus and proportionality as a condition of implementation of water quality, buffer and tree protection zone. There is no burden on the

> local government, nor any discretion authorized for the Department, to make some rational link demonstrating nexus proportionality or reasonable necessity under the specific circumstances between the project and the condition to be imposed. The imposition of water quality and tree protection buffers on a developing property do pose significant limitations on the use and further development of the affected properties.

Br. of Alliance at 17-18 (citations and footnote omitted). In an undeveloped section of its brief entitled "other issues," the Alliance includes the wetland buffers in the wetland ordinance in this argument. The Alliance argues that due to the absence of consideration for nexus and proportionality, the ordinances violate both RCW 82.02.020 and the takings clause of the United States Constitution. U.S. CONST. amend. V. The Alliance asks this court to reverse the Board decision upholding the ordinances.

The Board did not rule on issues raised under RCW 82.02.020 or the takings clause, recognizing it lacked authority to adjudicate issues other than compliance with the Growth Management Act. RCW 36.70A.280(1). The superior court concluded that these issues were not ripe because the Alliance did not challenge a specific decision about a specific parcel of land.

Facial challenges to land use ordinances have been reviewed under RCW 82.02.020 and under the takings clause. See, e.g., Citizens' All. for Prop. Rights v. Sims, 145 Wn. App. 649, 656, 187 P.3d 786 (2008), review denied, 165 Wn.2d 1030 (2009); Guggenheim v. City of Goleta, 638 F.3d 1111, 1116-17 (9th Cir. 2010), cert. denied, 131 S. Ct. 2455 (2011). We will address the facial challenge on the merits.

1. RCW 82.02.020

The Alliance first argues that the ordinances violate RCW 82.02.020. The meaning of RCW 82.02.020 is a question of law reviewed de novo. Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wn.2d 740, 757, 49 P.3d 867 (2002).

In the late 1970s, several counties authorized the imposition of fees on new development to pay for, among other things, parks, schools, roads, police, and fire services. Developers and homeowners who paid the fees sued, challenging the counties' authority to impose the fees. The Supreme Court held that the fees were really taxes and that no statute granted local governments the authority to impose taxes. Hillis Homes, Inc. v. Snohomish County, 97 Wn.2d 804, 808, 650 P.2d 193 (1982).

In response to Hillis Homes, the legislature amended RCW 82.02.020, adding the language at issue here. R/L Assocs., Inc. v. City of Seattle, 113 Wn.2d 402, 408-10, 780 P.2d 838 (1989), citing LAWS OF 1982, 1st Ex. Sess., ch. 49, § 5. As amended, RCW 82.02.020 prohibits local governments from imposing direct or indirect taxes, fees, or charges on the development, subdivision, classification, or reclassification of land.

> No county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land. However, this section does not preclude dedications of land or easements within the proposed development or plat which the county, city, town, or other municipal corporation can demonstrate are reasonably necessary as a direct result of the proposed development or plat to which the dedication of land or easement is to apply.

6

> This section does not prohibit voluntary agreements with counties, cities, towns, or other municipal corporations that allow a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development, subdivision, or plat.

RCW 82.02.020. RCW 82.02.020 requires strict compliance with its terms. Trimen Dev. Co. v. King County, 124 Wn.2d 261, 270, 877 P.2d 187 (1994); R/L Associates, 113 Wn.2d at 409.

The Alliance views the habitat ordinance as an exaction or dedication of the land that must be devoted to the buffer areas. According to the Alliance, the ordinance is flawed because it lacks a procedure to determine if, in a particular development proposal, the buffers are "reasonably necessary as a direct result" of the proposed development. The "reasonably necessary" requirement of RCW 82.02.020 incorporates the nexus and rough proportionality test articulated in Nollan v. California Coastal Commission, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987), and Dolan v. City of Tigard, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994).

The Alliance contends the habitat ordinance is like the King County land-clearing ordinance in Sims. That ordinance was invalidated because it failed "to relate the clearing limit to the nature and extent of the proposed development on the lot." Sims, 145 Wn. App. at 668. Because the clearing limits were not "impact specific," the ordinance did not satisfy the requirement for proportionality. Sims, 145 Wn. App. at 668.

The County persuasively distinguishes Sims. The ordinance at issue in Sims required all property owners in the rural residential zone to limit land

7

clearing to a maximum of 50 percent, without any mechanism for relating the extent of the restriction to specific features of the property. That is not the case with the San Juan County habitat ordinance. As the Board concluded, the amount of land to be devoted to buffers will depend on a number of factors specific to a site proposed for development.

The requirement for buffers satisfies the "reasonably necessary" test under RCW 82.02.020 for the additional reason that it is supported by the best available science. The Act requires local governments to "include the best available science in developing policies and development regulations to protect the functions and values of critical areas." RCW 36.70A.172(1). The record must contain evidence that the county "considered the best available science substantively in its development of the critical areas ordinance." Yakima County v. E. Wash. Growth Mgmt. Hr'gs Bd., 168 Wn. App. 680, 704, 279 P.3d 434 (2012). A county or city departing from science-based recommendations should:

> (i) Identify the information in the record that supports its decision to depart from science-based recommendations;
> (ii) Explain its rationale for departing from science-based recommendations; and
> (iii) Identify potential risks to the functions and values of the critical area or areas at issue and any additional measures chosen to limit such risks. State Environmental Policy Act (SEPA) review often provides an opportunity to establish and publish the record of this assessment.

WAC 365-195-915(c).

San Juan County identified the best available science as the first step in updating the critical area ordinances. The County's best available science is found in a 530-page synthesis prepared by a team of scientists and natural

8

resource planners for the San Juan County Planning Commission. It is a summary of the available scientific studies on each of the topics it addresses, including habitat conservation areas. It identifies "management options the County might employ to better protect these areas." Administrative Record (AR) at 3479. At the end of each chapter, the document lists the scientific literature relied on to support the conclusions reached. After this document was prepared, the County received recommendations for amendments to the existing regulations and considered the public input before adopting the final ordinances.

The County argues that the buffer requirements in the habitat ordinance satisfy the nexus and proportionality test incorporated into RCW 82.02.020 because they are supported by the best available science. This argument is supported by Kitsap Alliance of Property Owners (KAPO) v. Central Puget Sound Growth Management Hearings Board, 160 Wn. App. 250, 255 P.3d 696, review denied, 171 Wn.2d 1030 (2011), cert. denied, 132 S. Ct. 1792 (2012). KAPO arose out of Kitsap County's efforts to update its critical areas ordinances. The County adopted an ordinance, approved by the Growth Management Board, providing for a marine shorelines buffer of 50 feet in urban areas and 100 feet in rural and semi-rural areas. Because the county had "considered the best available science and employed a reasoned process in adopting its shoreline critical areas ordinance, including the buffers for urban, semirural, and rural shorelines," the court concluded that the permit decisions the County based on those regulations would satisfy the nexus and rough proportionality tests. KAPO, 160 Wn. App. at 273-74, citing Honesty in Envtl. Analysis & Legislation (HEAL) v.

Cent. Puget Sound Growth Mgmt. Hrgs. Bd., 96 Wn. App. 522, 534, 979 P.2d 864 (1999); see also Olympic Stewardship Found. v. W. Wash. Growth Mgmt. Hr'gs Bd., 166 Wn. App. 172, 274 P.3d 1040, review denied, 174 Wn.2d 1007 (2012).

The County's position is also supported by Trimen. Trimen arose out of a dispute about King County's authority to enact and enforce a park fee ordinance. The ordinance made final approval of subdivisions contingent on reservation or dedication of land for the open space and recreational needs of the subdivision's residents, or payment of a fee-in-lieu thereof. A development company filed an action challenging the park fee ordinance under RCW 82.02.020, seeking restitution of the fees it had paid in lieu of dedicating land. Relevant here is the Supreme Court's rejection of the developer's argument that the county had failed to identify a direct impact or result of its development requiring mitigation. The court determined that the county's previous comprehensive assessment of its park needs, even though it was not a site-specific study, showed that the park fees were reasonably necessary as a direct result of Trimen's development:

> Although Trimen is correct that King County did not conduct a site-specific study, the record indicates that the ordinance's requirement—to either dedicate land for open space or pay a fee in lieu of dedication—was reasonably necessary as a direct result of Trimen's development. See View Ridge Park Assocs. v. Mountlake Terrace, 67 Wn. App. 588, 599, 839 P.2d 343 (1992) (ordinance adopted prior to the filing of a plat application can be construed as a measure taken to mitigate a direct impact that has been identified as a consequence of a proposed development), review denied, 121 Wn.2d 1016 (1993).
> King County conducted a comprehensive assessment of park needs in a 1985 report titled, Interim Assessment of King County Park Needs. The report indicated that there was a deficit of approximately 107 park acres in the Northshore area serving the

> Winchester Hills I and II subdivisions. Based on adopted county standards, the report stated that over 300 acres of additional park land will be required in this area by the year 2000 to provide for the projected increase in population. Trimen's proposed subdivisions, with an expected occupancy average of three people per each of 112 potential residential units, created a need for an additional 2.52 acres of park land. The dedication or reservation of open space requirement of KCC 19.38, calculated at a reduced, negotiated figure of 5 percent, would have resulted in 2.096 acres of park and open space land. We conclude therefore that the fees imposed in lieu of dedication were reasonably necessary as a direct result of Trimen's proposed development. See Dolan v. Tigard, 62 U.S.L.W. 4576 (U.S. June 24, 1994) ("rough proportionality" between required dedication and impact of proposed development).

Trimen, 124 Wn.2d at 274. Cf. Isla Verde, 146 Wn.2d 740 (open space set aside ordinance invalidated under RCW 82.02.020 because unlike in Trimen, there was no comprehensive study backing up the city's claimed need for open space to serve projected development).

Here, as in Trimen, the challenged ordinances impose limits on development near critical areas and require buffers based on a comprehensive study of the effect of development near critical areas. The county's "best available science" document was prepared as the first step in updating the ordinances, and it demonstrates that buffers are reasonably necessary to protect critical fish and wildlife habitat. We reject, as the Supreme Court did in Trimen, the argument that a comprehensive study cannot support the imposition of development regulations unless it looks at a specific development proposed. Trimen, 124 Wn.2d at 274.

We conclude the critical area ordinances do not violate RCW 82.02.020.

2. Constitutional argument—Nollan and Dolan

The Alliance, supported by the Pacific Legal Foundation as amicus, also argues that the buffers required by the habitat ordinance constitute unconstitutional conditions in violation of Nollan and Dolan. Again, the argument is that the ordinance impermissibly imposes inflexible blanket rules, like requiring a water quality buffer or protection of all trees within 110 feet of aquatic critical areas.

Both Nollan and Dolan involved permits. The landowner in Nollan was given a permit to build a house on the beach in California on the condition that he dedicate a public easement across his property to permit physical access by the public to the public beach near Nollan's property. This was necessary according to the government because the development would block the public's view of the beach. The United States Supreme Court invalidated this condition, finding there was no nexus between the impact of Nollan's proposed development (blocking the public's *view* of the beach) and the condition imposed (granting public, *physical access* to the beach across Nollan's property). The landowner in Dolan was given a permit to double the size of her hardware store and add a paved parking lot. Because part of the lot was in the adjacent creek's 100-year floodplain and a study had shown flooding would be exacerbated by increased development, the city conditioned her permit on the dedication of a portion of her property for improvement of a storm drainage system. The Supreme Court found no problem with this condition because it had an obvious nexus with the impact of the particular development. Because the city found that

12

new development would also worsen traffic congestion in the area, the city also required her to dedicate a strip of land as a public greenway for pedestrians and bicyclists. The Supreme Court found this condition lacked proportionality. "It is difficult to see why recreational visitors trampling along petitioner's floodplain easement are sufficiently related to the city's legitimate interest in reducing flooding problems along Fanno Creek, and the city has not attempted to make any individualized determination to support this part of its request." Dolan, 512 U.S. at 393. Further, the court noted that while the traffic study concluded that a pedestrian lane *could* alleviate some of the congestion caused by increased development in the area, nowhere did anyone find that it *would*. "No precise mathematical calculation is required, but the city must make some effort to quantify its findings in support of the dedication for the pedestrian/bicycle pathway beyond the conclusory statement that it could offset some of the traffic demand generated." Dolan, 512 U.S. at 395-96.

The Nollan/Dolan test is a special application of the unconstitutional conditions doctrine that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits. Dolan, 512 U.S. at 385; Koontz v. St. Johns River Water Mgmt. Dist., ___ U.S. ___,133 S. Ct. 2586, 2594, 186 L. Ed. 2d 697 (2013). Under the unconstitutional conditions doctrine, the government may not deny a benefit to a person because he exercises a constitutional right. This principle "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." Koontz, 133 S. Ct. at 2594.

13

The Nollan/Dolan test reflects two realities of the land use permitting process. First, land use permit applicants are especially vulnerable to coercion because the government often has broad authority to deny a permit that is worth far more than the property it would take. And second, many proposed land uses threaten to impose costs on the public that dedications of property can offset. Koontz, 133 S. Ct. at 2594-95. A local government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts. Koontz, 133 S. Ct. at 2595.

Certainly, a land use ordinance can be facially challenged as a regulatory taking. But the Alliance has not cited a case where the constitutional Nollan/Dolan test has been applied to invalidate land use ordinances of general application, as the Alliance seeks to do here. Indeed, it appears that the courts have confined Nollan/Dolan analysis to land use decisions that condition approval of a specific project on a dedication of property to public use:

> We have not extended the rough-proportionality test of Dolan beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use.

City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 702, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999); see also Koontz, 133 S. Ct. at 2594-96. This makes sense. An ordinance requiring a buffer zone is a legislative act, not a land use decision. Legislative determinations do not present the same risk of coercion as adjudicative decisions. See Koontz, 133 S. Ct. at 2594-95. The

briefing here provides inadequate authority for an extension of the Nollan/Dolan test to a facial challenge of a critical areas ordinance.

Even assuming the Nollan/Dolan test can be applied to determine whether a land use ordinance constitutes a taking, the Alliance has not shown that a taking occurred by the enactment of the San Juan County critical areas ordinances.

Because the Nollan/Dolan test is a special application of the unconstitutional conditions doctrine, every United States Supreme Court decision applying it has asked first whether the government demands an exaction that would be an unconstitutional taking outside the permitting process. Nollan, 483 U.S. at 834; Dolan, 512 U.S. at 384; Koontz, 133 U.S. at 2598-99. If the exaction does not constitute a taking, the condition is not unconstitutional and the inquiry ends.

First, we are unpersuaded that the requirement for buffers is an exaction or a dedication. No interest in land will be transferred or conveyed by the operation of the San Juan County ordinances. The property owner can use the buffer for all authorized uses and can exclude others. In this respect, the buffers are like setbacks in zoning regulations.

Second, the United States Supreme Court has recognized three types of regulatory takings under the Fifth Amendment to the United States Constitution: (1) appropriation of land through physical occupation, (2) the deprivation of all economically viable uses, and (3) those that fail the three-part test of Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124, 98 S. Ct.

2646, 57 L. Ed. 2d 631 (1978). Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538-41, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005). The Alliance does not allege that the ordinances are any of these three types of takings. The buffers required by the San Juan County ordinances do not constitute a physical occupation. Cf. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982) (physical occupation by installation of telecommunications equipment). The ordinances are not like the regulation in Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1033, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992), which was considered a taking because it left the plaintiff's land "valueless." San Juan County included a "reasonable use exception" to ensure that some development could be allowed where strict application of the ordinances would deprive an owner of all economically viable use of their land (e.g., where the entire parcel constitutes a critical area). Under Lucas, where a regulation is not a "total taking," it is not a taking at all. Lucas, 505 U.S. at 1030. Finally, the Penn Central test focuses on the precise impacts of particular regulations on a particular claimant in light of a specific development proposal. It does not provide an analysis that can be used to invalidate the critical areas ordinances.

In summary, the Alliance's facial challenge fails. Site-specific flexibility was built into the ordinances through exemptions, buffer averaging, and the reasonable use exemption. The County's use of best available science establishes the reasonable necessity of buffers to protect habitat and demonstrates a proportional relationship between the impacts of development

16

and the measures adopted to mitigate it. The ordinances do not violate the unconstitutional conditions doctrine.

## Second Issue: Designation of critical areas

The Alliance next argues that the habitat ordinance violates the Growth Management Act and its associated regulations and is not supported by substantial evidence.

Comprehensive plans and development regulations passed to comply with the Growth Management Act are presumed valid upon adoption. RCW 36.70A.320(1). Parties may file a petition for review of such regulations with the Growth Management Board. RCW 36.70A.290.

To prevail before the Board, the challenger must demonstrate that the challenged actions are not in compliance with the Growth Management Act. RCW 36.70A.320(2). The Board is required to find compliance unless it determines that the challenged regulation is clearly erroneous in view of the entire record before it and in light of the goals and requirements of the Act. RCW 36.70A.320(3). In reviewing planning decisions by local governments, the legislature has instructed the Board to recognize the broad range of discretion that may be exercised by counties and cities and to grant deference to them in how they plan for growth. RCW 36.70A.320(1). The Board must give the local government's actions a critical review. This is a more intense standard of review than the arbitrary and capricious standard. Swinomish Indian Tribal Cmty. v. W. Wash. Growth Mgmt. Hr'gs Bd., 161 Wn.2d 415, 435 n.8, 166 P.3d 1198 (2007).

Parties may file a petition for review of the Board's decision in superior court within 30 days of the final order of the Board. RCW 36.70A.300(5). Decisions of the Growth Management Hearings Board are reviewed under the Administrative Procedure Act, chapter 34.05 RCW. RCW 36.70A.300(5), citing RCW 34.05.514; Lewis County v. W. Wash. Growth Mgmt. Hr'gs Bd., 157 Wn.2d 488, 497, 139 P.3d 1096 (2006).

Under the Administrative Procedure Act, the burden of demonstrating invalidity of an agency action is on the party asserting invalidity. RCW 34.05.570(1)(a). A court may grant relief from a decision of the Board only under certain, enumerated circumstances including (1) if the Board has erroneously interpreted or applied the law or (2) if the order is not supported by evidence that is substantial when viewed in light of the whole record before the court. RCW 34.05.570(3). "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of a declared premise. King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 142 Wn.2d 543, 553, 14 P.3d 133 (2000).

The Alliance argues that the County's system for designating critical areas violates RCW 36.70A.480 because it uses performance standards to identify the critical areas during the permitting process rather than specifically identifying them on a map. The Board rejected the argument that RCW 36.70A.480 requires counties to map and specifically identify shoreline critical areas, finding

> there is no definition in the statute for the term "specific areas," and these Petitioners cite no legal authority to support the argument. To the contrary, Department of Commerce regulations specifically anticipate the need to designate critical areas using "maps" and/or "performance standards," with a preference for performance

18

standards when adopting land use regulations because maps are less precise. WAC 365-190-040(5)(b).

Board decision at 90.

We agree with the Board and find the Alliance's construction of the statute unpersuasive. RCW 36.70A.480(5) was passed by the legislature to clarify its intent that all shorelines are not per se critical areas. LAWS OF 2003, ch. 321, §1. The statute states that shorelines are not critical areas except to the extent that they meet the definition of critical area provided by RCW 36.70A.030(5).

> (5) Shorelines of the state shall not be considered critical areas under this chapter except to the extent that specific areas located within shorelines of the state qualify for critical area designation based on the definition of critical areas provided by RCW 36.70A.030(5) and have been designated as such by a local government pursuant to RCW 36.70A.060(2).

RCW 36.70A.480. Because the County did not classify all shorelines as per se critical areas, it did not violate RCW 36.70A.480(5).

As the Board recognized, WAC 365-190-040(5) explicitly contemplates that counties will officially designate critical areas at the time of processing a permit or a development authorization. WAC 365-190-040(5)(b). Counties designating critical areas first engage in "classification"—defining categories to which natural resource lands and critical areas will be assigned. WAC 365-190-040(4). "Not all areas classified by state agencies must be designated, but such areas may be likely candidates for designation." WAC 365-190-040(4)(b). "Designation means, at a minimum, formal adoption of a policy statement, and may include further legislative action. Designating inventoried lands for comprehensive planning and policy definition may be less precise than

19

subsequent regulation of specific parcels for conservation and protection." WAC 365-190-040(5)(c). The ordinances at issue here constitute a "formal adoption of a policy statement" that can be used to identify critical areas "during the processing of a permit or development authorization." WAC 365-190-040(5)(b)(c).

The Alliance asserts that the Board's decision is inconsistent with another decision of the Board, where it rejected a similar, site-by-site assessment process. Br. of Alliance at 28, citing Tahoma Audubon Soc'y v. Pierce County, No. 05-3-0004c, 2005 WL 2227915 (Wash. Cent. Puget Sound Growth Mgmt. Hrgs. Bd. July 12, 2005) (Final Decision and Order). In Tahoma Audubon, the Board did reject Pierce County's site-by-site assessment process to be performed during the permit application process. But as the superior court correctly noted, the Board did not reject Pierce County's assessment process *because* it was site-by-site. Rather, Pierce County's assessment process was rejected because it had deleted *all* marine shorelines from its list of critical areas. Tahoma Audubon, 2005 WL 2227915, at *43.

We conclude that the Alliance has failed to establish that the County's system for designating critical areas violates the Act. Mapping is not required.

### Third Issue: WAC 365-190-030(6)

In what appears to be a variation of the second issue, the Alliance argues that the fish and wildlife habitat conservation ordinance fails to comply with the requirements definition provided in WAC 365-190-030(6).

> "Fish and wildlife habitat conservation areas" are areas that serve a critical role in sustaining needed habitats and species for the

functional integrity of the ecosystem, <u>and which, if altered, may reduce the likelihood that the species will persist over the long term.</u> These areas may include, but are not limited to, rare or vulnerable ecological systems, communities, and habitat or habitat elements including seasonal ranges, breeding habitat, winter range, and movement corridors; and areas with high relative population density or species richness. Counties and cities may also designate locally important habitats and species.

WAC 365-190-030(6)(a) (emphasis added).

The Alliance faults the County in conclusory fashion for failing to "even pay lip service" to the above definition. Br. of Alliance at 31. This argument is difficult to understand. The "if altered" clause does not mean that all potential critical habitat areas must be specifically evaluated and mapped out in advance of development activity. Again, the Act does not require that a critical areas ordinance take a parcel-by-parcel approach.

The Alliance has failed to show that the habitat ordinance violates the Act in the way it designates critical areas.

## Fourth Issue: Best available science & buffers

The Alliance's last argument is that the necessity for universal application of the requirements for water quality buffers and tree protection zones is not supported by best available science. Once more, the concern is with an alleged lack of proportionality. The Alliance uses the example that a property owner might have to devote a significant amount of land as a buffer merely to protect an offshore kelp bed or a single isolated tree. According to the Alliance, the County's synthesis of best available science does no more than establish generally that marine habitats are important, rather than demonstrating the

precise circumstances under which buffers are reasonably necessary to mitigate particular impacts that may occur as the result of a specific project.

The Board rejected this argument. "The further argument that wetland buffers have been imposed without regard to necessity is refuted by analysis of the record and the methodology established by the ordinances." Board decision at 27. We agree. The synthesis document shows that wetland buffers stop pollution from disrupting the functions of wetlands. It also shows that buffers to habitat conservation areas protect wildlife from the effects of pollution and runoff from adjacent, developed areas. The ordinances provide step-by-step instructions for determining whether buffers are necessary and if so, how wide they should be. Ordinance 28-2012 at 18-23; Ordinance 29-2012 at 16-17.

The Alliance's briefing on this issue consists of little more than conclusory assertions. We conclude that the Alliance has failed to establish that the marine buffers and tree protection zones are unsupported by the best available science.

FRIENDS APPEAL

## Exclusion of small wetlands

Friends argues that the Board incorrectly upheld the County's decision to exclude small, isolated wetlands from protective regulation. Friends frames this argument, as it frames all its arguments, as both an erroneous interpretation or application of law and a failure to rely on substantial evidence.

The wetlands ordinance exempts medium habitat importance-sensitivity wetlands that are less than 1,000 square feet and low habitat importance-

sensitivity wetlands that are less than 2,500 square feet, unless the small wetland is part of a wetland mosaic greater than 2,500 square feet.

The wetlands ordinance acknowledges that excluding small wetlands from regulation potentially departs from the best available science. The County explains that the minimum size threshold is necessary to "allow for reasonable and cost effective application of the regulations." Ordinance 28-2012 at 9. The County also explained that it used light detection and radar (LiDAR) and aerial imaging to survey the county's wetlands. Using that technology, wetlands smaller than 1,000 square feet could not be detected.

The Board noted that the County had incorporated restrictive language suggested by the Department of Ecology and concluded that the County had adequately limited the exemption for small wetlands. Board Decision at 72-73. Friends argues on appeal that the Board's inquiry into this issue was not sufficiently intense and that the decision departed from previous Board rulings striking down similar provisions.

The superior court correctly distinguished the previous Board rulings on the ground that, unlike in this case, exceptions had been adopted that departed from the best available science without an adequate rationale under WAC 365-195-915. Superior court decision at 27. The record does not bear out Friends' allegation that the Board was lax in its enforcement. The County's synthesis of best available science explicitly contemplates the exclusion of small wetlands from regulation—one subsection is named "Establishing Minimum Wetland Size for Regulation." Excluding small, isolated wetlands is, perhaps, not ideal. But as

23

both the Board and the superior court found, it is not necessarily a violation of the Act.

## View protection

Ordinance 29-2012 provides for development buffers on shorelines near habitat conservation areas. Because the County deemed it important to protect residential views in San Juan County, the ordinance permits these buffers to be reduced where existing houses on adjacent waterfront parcels are closer to the water than is permitted by the current code provision. Shoreline buffers may be narrowed to accommodate views where (1) adverse impacts are identified by a qualified professional, (2) adverse impacts are mitigated, and (3) the zone remains the larger of (a) the waterward side of a line drawn between the most waterward points of the houses on the adjoining parcels and (b) the average of the distances from the ordinary high water mark to the most waterward points of the houses on the adjoining parcels. Ordinance 29-2012 at 23-24.

The Board concluded that the view exception is sufficiently limited. Friends argues that the Board failed to address the fact that the best available science "reveals the low likelihood of replacing lost functions" through marine mitigation attempts. But the Board did address this concern. The Board found that mitigation of impacts is an accepted practice even though it is not always effective. The Board approved the ordinances because of their primary focus on avoidance of adverse impacts. We find no error.

## Tree protection zone averaging

Friends argues that the Board erred in upholding the County's decision to permit "tree zone averaging."

A "tree protection zone" is a protective area established around a tree or cluster of trees. Ordinance 26-2012 at 38. Ordinance 29-2012 permits "averaging of tree protection zones" under certain circumstances.

> **Averaging of Tree Protection Zones.** Averaging of Tree Protection Zones allows reduction of the zone in specified locations on the property proposed for development, vegetation removal or other site modification, in conjunction with increases of the zone in other areas, so that the total area of the zone is unchanged. The applicant may average the Tree Protection Zone if all of the following criteria are met:
> a. Averaging is necessary to accomplish the purposes of the proposal, and no reasonable alternative is available;
> b. The total area contained within Tree Protection Zones after averaging is no less than that contained within the Zones prior to averaging;
> c. Only areas with trees located within 200 feet of the OHWM or bank full width will be counted toward the required area of the Tree Protection Zones; and
> d. In no case shall the Tree Protection Zones be reduced to less than the water quality buffer or 70 feet, whichever is greater.

Ordinance 29-2012 at 18.

Friends argued that the ordinance impermissibly uses tree zone averaging as a means to reduce the protection of trees. The Board concluded that Friends failed to carry its burden:

> Buffer averaging is also subject to specific conditions. First of all, even with averaging, the total area of the tree protection zone may not be decreased. Secondly, the [tree protection zone] may not be reduced through averaging to a width less than the water quality buffer or 70 feet, whichever is greater. Finally, averaging is allowed only to "accomplish the purposes of the proposal" and only then when no reasonable alternative is available. Consequently,

25

the Board concludes buffer averaging may be appropriate with the caveat that the minimum water quality buffer width needs to reflect consideration of [the best available science].

Board decision at 64-65 (footnote and emphasis omitted).

On appeal, Friends argues that (1) the Board failed to determine whether the impacts authorized by the averaging provision protect critical areas or include the best available science, (2) permitting averaging is inconsistent with the Board's own decision in ReSources, Inc. v. City of Blaine, No. 09-2-0015, 2010 WL 3950500 (W. Wash. Growth Mgmt. Hr'gs Bd. Mar. 29, 2010) (Final Decision and Order), and (3) averaging is inconsistent with the Department of Ecology's recommendations. The County responds that Friends is not arguing that the regulations chosen by the County fail to comply with the Act, "but rather that, in Friends' opinion, the County could have done better. This is not the standard and does not meet Friends' burden." Br. of County at 42.

The County is correct. We are not here to determine whether or not the Board failed to determine the impacts of tree zone averaging. Our issue is whether the Board erroneously concluded that Friends had failed to meet its burden of proof. We find no error.

**Devegetation in tree protection zones**

Friends argues that the Board erred in upholding the County's decision to permit devegetation in tree zones.

To allow for a view or fire hazard reduction, the habitat conservation ordinance permits "minor trimming and pruning of the foliage of trees" in tree zones provided that the health of the trees is maintained, trees are not topped,

26

and all branches and foliage overhanging aquatic fish and wildlife habitat conservation areas is retained. Ordinance 29-2012 at 19. "In no case shall more than 20% of the foliage of a tree be removed during one 12-month period." Ordinance 29-2012 at 19. No tree removal is allowed within the first 35 feet. Within the rest of the tree zone, construction of one primary structure or limited tree removal to allow for a filtered view from the primary structure is allowed where a number of very specific conditions are met. Ordinance 29-2012 at 19.

The Board concluded that Friends had failed to come forward with scientific information showing that the devegetation provisions violate the Act. Board decision at 79-80. The superior court agreed and noted that Friends was relying on general data concerning the adverse impacts that can follow from the removal of trees or vegetation located in buffers, rather than specific studies that suggest a different specific limit on removal of vegetation. "As noted several times above, regulations that limit, but do not absolutely prohibit, a use or activity do not necessarily fail to comply" with the Growth Management Act requirement to protect critical areas. Superior court decision at 28-29. Friends' argument on appeal has the same problem of lack of specificity as noted by the trial court. Friends essentially asserts that any removal of vegetation renders the buffer inadequate. The record does not bear out this assertion. In fact, as the Board recognized, the County relied on best available science suggesting that many wetland animals benefit from minor pruning because it leads to more sunshine and warmer temperatures.

## Gardens & orchards in buffers

Friends argues that the Board erred in upholding the County's decision to permit landowners to develop orchards and gardens in wetland and habitat buffers. Orchards and gardens are permitted in buffers to low or medium habitat importance-sensitivity wetlands and water quality buffers of aquatic habitat conservation areas. This exception is subject to specific conditions of size, location, protection of trees, a ban on structures or impervious surfaces other than fences, and a variety of performance standards.

As a general matter, the best available science holds that agricultural practices, like the use of synthetic chemicals, can disturb critical area functions. Allowing orchards and gardens in buffers was a departure from the best available science. The County explained that the exception responded to public testimony "regarding the importance of wetlands and surrounding areas for food production in a community that is isolated from the mainland and has dry summers and limited supplies of fresh water." Ordinance 28-2012 at 9. The ordinance states that with the conditions imposed, "it is anticipated that the soils in gardens and orchards will, in most cases, maintain high levels of organic material, and as a result will remain permeable and able to absorb runoff from upland areas." Ordinance 28-2012 at 9. The Board concluded that Friends had failed to meet its burden to establish that these provisions permitting orchards and gardens violated the Act.

Friends fails to show how the development of orchards and gardens in critical area buffers violates the Act. The County adequately complied with WAC 365-195-915 by explaining its departure from the best available science.

**Reasonable use exception**

Friends last argues that the Board erred when it upheld the County's reasonable use exception.

The reasonable use exception allows some development of a parcel where strict adherence to the critical areas ordinances would deprive a landowner of all economic and beneficial use of her property. Under this exception, landowners may choose between two options for development: (1) low impact development of up to 2,500 square feet of the parcel with no mitigation or (2) the minimum area necessary to allow for the reasonable use of the property if adverse impacts are mitigated. Ordinance 26-2012 at 43-44.

The Board concluded that Friends' arguments consist of "mere assertions" that fail to establish violations of the Act because they are not related to specific results. Board decision at 33. We agree. The Growth Management Act explicitly states legislative intent that regulations not work a taking of private property without just compensation. RCW 36.70A.020(6).

In summary, Friends fails to show that the Board erred, either legally or by failing to rely on substantial evidence, in its rulings upholding the challenged portions of the San Juan County critical areas ordinances.

The decision of the superior court is affirmed.

29

WE CONCUR:

_Becker, J._

_Leach, J._

_Appelwick, J._