
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| HERITAGE BAPTIST CHURCH, a Washington nonprofit organization | ) ) ) | No. 75375-4-I |
| Appellant, | ) ) ) | DIVISION ONE |
| v. | ) ) ) | PUBLISHED OPINION |
| CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD, an agency of the State of Washington; BRANDI BLAIR, MATTHEW BLAIR, BREET BLAIR, JAMES BLAIR, LOWELL ANDERSON, DOUGLAS HAMAR, and CHAD MCCAMMON; and THE CITY OF MONROE, a political subdivision of the State of Washington, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) | FILED: March 12, 2018 |

TRICKEY, J. — Heritage Baptist Church (Heritage) sought to rezone its property in the city of Monroe (City). The City enacted ordinances in 2013 enabling the rezone. In 2014, the Central Puget Sound Growth Management Hearings Board (the Board) issued an order of invalidity (2014 order) and remanded the ordinances to the City. In 2015, Heritage and the City published a supplemental environmental impact statement (SEIS) and the City adopted new ordinances for the rezone. In 2016, the Board issued an order finding continuing noncompliance (2016 order). Heritage directly appeals the Board's 2016 order. Finding no error, we affirm.

FACTS

The Property

Heritage owns approximately 43 acres of undeveloped land (the Property) split into five parcels near the City's eastern boundary. The Property is located within the Skykomish River drainage basin and floodplain, and is bordered by State Route 2 to the south and a steep hillside to the north. The Property regularly floods, and can experience up to 8 feet of flooding during a 100-year flood event. The City's regulations and Federal Emergency Management Agency (FEMA) 1999 Flood Insurance Rate Maps (FIRMs) adopted by the City state that the Property is in a 500-year floodplain. Preliminary 2007 FIRMs place the Property within a 100-year floodplain, although the City and FEMA have not adopted these maps.

The Skykomish River valley is bordered by several ridges. The Property is located primarily on the valley floor and extends up an adjacent slope between 60 and 250 feet. The northern portion of the Property and adjoining properties are classified by the United States Department of Agriculture as severe erosion hazard areas. A geological report noted several recent landslides and evidence of slope failure under a home and its associated property at the top of the northwest section of the slope.

An oxbow slough designated as a Type 1 stream runs through the Property and connects to the Skykomish River. The slough is designated as an urban conservancy, and supports listed threatened and endangered species of fish.

The Property contains category two and category three wetlands, which are critical areas protected under the Monroe Municipal Code (MMC). The Property

2

also contains a native growth protection area (NGPA). The NGPA and the City's critical area regulations limit the presently developable area of the Property to approximately 11.3 acres.

The Property is currently zoned as limited open space (LOS). LOS zoning allows "at a minimum level of development, one dwelling unit per five acres," with commercial or more intensive uses only allowed as conditional uses.

In July 2010, Heritage and East Monroe Economic Development Group, LLC submitted an application to amend the City's comprehensive plan and rezone the Property from LOS to general commercial (GC). GC zoning would allow for more intensive development, with the final environmental impact statement (FEIS) proposing "a mixture of commercial development, including retail and restaurant development."[1] In 2012, the City issued a final phased environmental impact statement (FPEIS) and adopted Ordinance 018/2012 to amend its comprehensive plan to rezone the Property.

Lowell Anderson, a resident of the City, challenged the FPEIS and Ordinance 018/2012 before the Monroe Hearing Examiner. The hearing examiner concluded that the FPEIS was inadequate as a matter of law.[2] The Monroe City Council repealed Ordinance 018/2012 and re-docketed the Property for comprehensive plan review in 2013. Anderson's challenges to the FPEIS and ordinance were dismissed as moot.

---

[1] Clerk's Papers (CP) at 3687.
[2] CP at 450-51 (The Board took official notice of the hearing examiner's decision in the 2012 FPEIS appeal.).

Heritage hired PACE Engineering, Inc. to perform environmental impact analyses to support the rezone. In September 2013, the City, as lead agency under the State Environmental Policy Act (SEPA), chapter 43.21C RCW, issued a FEIS for the rezone. The FEIS offered three alternative development plans to Heritage's proposed reclassification: (1) an LOS alternative, including a fitness facility, daycare, and church; (2) a GC alternative, including retail and restaurants; and (3) a mixed use commercial, including professional offices, a medical center, and residential development.

Anderson again challenged the FEIS before the City's hearing examiner, arguing that the FEIS did not adequately consider and analyze the Property's present use or the environmental impacts of the reclassification. The hearing examiner upheld the adequacy of the FEIS.

In December 2013, the Monroe City Council adopted Ordinance 022/2013 to amend the comprehensive plan and Ordinance 024/2013 to reclassify the Property from LOS to GC (together, 2013 ordinances). Brandi Blair, Matthew Blair, Brett Blair, James Blair, Anderson, Douglas Hamar, and Chad McCammon challenged the 2013 ordinances before the Board in several petitions for review. The petitions were consolidated before the Board.[3]

In August 2014, the Board issued its final decision and order.[4] The 2014 order found that the FEIS was inadequate under SEPA because it did not properly inform decision-makers of the impacts of the rezone. The Board concluded that

---

[3] Blair v. City of Monroe, No. 14-3-0006c, 2014 WL 1218356 (Wash. Growth Mgmt. Hr'gs Bd. Mar. 10, 2014).

[4] In September 2014, the Board issued a nunc pro tunc order correcting scrivener's errors in the final decision and order.

the continuing validity of the 2013 ordinances would interfere with the Growth Management Act's (GMA), chapter 36.70A RCW, goal of protecting the environment. The Board remanded the 2013 ordinances to the City and entered a determination of invalidity.

The City did not appeal the Board's 2014 order. Heritage intervened as a compliance participant to assist the City with complying with the Board's 2014 order. In August 2015, the City, Heritage, and PACE issued a draft SEIS. The draft SEIS incorporated the 2013 FEIS by reference and included appendices with expert reports examining the conditions of the Property's wetlands and habitats, the impacts of fill and compensatory flood storage, and the Property's topography and landslide hazards.

In September 2015, PACE presented the draft SEIS to the Monroe Planning Commission. The planning commission voted six to one against recommending that the City move forward with the reclassification.

In October 2015, PACE and the City's SEPA official presented the draft SEIS to the Monroe City Council. On November 2, 2015, the City released the final SEIS. On November 24, 2015, the Monroe City Council voted four to three to adopt Ordinances 015/2015 and 016/2015 (2015 ordinances), which allowed the rezone.

The Board held a compliance hearing and, in April 2016, issued an order finding continuing noncompliance (2016 order). The Board found that the SEIS used a true no-action development alternative. But it also found that the SEIS failed to provide an impartial assessment or sufficient discussion of the probable

environmental consequences of the reclassification, properly analyze the foreseeable adverse environmental impacts on the entire Property, and provide a reasonably thorough analysis of significant aspects of the possible environmental consequences. The Board concluded that the 2015 ordinances would substantially interfere with GMA's goal of protecting the environment. The Board remanded the 2015 ordinances to the City and entered a determination of invalidity.

Heritage applied for direct review of the Board's decision and sought discretionary review by this court. The Snohomish Superior Court, having heard no objection from the Board, certified the case for direct review by this court. On August 8, 2016, a commissioner of this court granted discretionary review.

ANALYSIS

Scope of 2016 Order

Heritage argues that the Board[5] improperly expanded the scope of its review in its 2016 order to include issues that had been dismissed by the 2014 order. But Heritage cites only to the concurring opinion of the Board's 2016 order, which criticized Heritage's failure to provide a new transportation analysis despite the 2014 order's determination that the City's traffic conclusions were not credible. Heritage has not demonstrated that the concurring opinion required additional actions or reargument of the issue before the Board. We reject Heritage's

---

[5] We note that Central Puget Sound Growth Management Hearings Board, Brandi Blair, Matthew Blair, Brett Blair, James Blair, Lowell Anderson, Douglas Hamar, Chad McCammon, and the City of Monroe are all respondents in this appeal.

argument and conclude that the Board did not improperly expand the 2016 order's scope of review.

## Review Framework

### Board Review of Local Planning Actions

The Board "is charged with adjudicating GMA compliance and invalidating noncompliant plans and development regulations." Lewis County v. W. Wash. Growth Mgmt. Hr'gs Bd., 157 Wn.2d 488, 497, 139 P.3d 1096 (2006) (citing RCW 36.70A.280, .302). The Board hears petitions pertaining to "state agency, county, or city planning" compliance with the GMA or an environmental impact statement's (EIS) compliance with SEPA. RCW 36.70A.280(1)(a); see also chapter 41.21C RCW.

Under the GMA, comprehensive plans and development regulations are presumed valid when adopted, and thus the Board must "grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of" the GMA. RCW 36.70A.320(1)-(2). But "deference to counties remains 'bounded . . . by the goals and requirements of the GMA.'" Whatcom County v. Hirst, 186 Wn.2d 648, 667, 381 P.3d 1 (2016) (quoting King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 142 Wn.2d 543, 561, 14 P.3d 133 (2000) (hereinafter referred to as Soccer Fields)[6]). Therefore, the Board "'shall find compliance' unless it determines that a county action 'is clearly erroneous in view of the entire record before the board and in light of the goals and

---

[6] This is the naming convention used in Lewis County. See 157 Wn.2d at 497.

requirements' of the GMA." Lewis County, 157 Wn.2d at 497 (quoting RCW 36.70A.320(3)).

"To find an action 'clearly erroneous,' the Board must have a 'firm and definite conviction that a mistake has been committed.'" Lewis County, 157 Wn.2d at 497 (quoting Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County, 121 Wn.2d 179, 201, 849 P.2d 646 (1993)). "[A] board's ruling that fails to apply this 'more deferential standard of review' to a county's action is not entitled to deference from [an appellate court]." Quadrant Corp. v. State Growth Mgmt. Hr'gs Bd., 154 Wn.2d 224, 238, 110 P.3d 1132 (2005).

If the Board finds that the state agency, county, or city is not in compliance with the GMA, it "shall remand the matter to the affected state agency, county, or city." RCW 36.70A.300(3)(b). "A county or city subject to a determination of invalidity made under RCW 36.70A.300 . . . has the burden of demonstrating that the ordinance or resolution it has enacted in response to the determination of invalidity will no longer substantially interfere with the fulfillment of the goals of the [GMA]." RCW 36.70A.320(4).

Administrative decisions state that an ordinance adopted in response to a finding of invalidity is accorded a presumption of validity. RCW 36.70A.320(1); see Abenroth, et al. v. Skagit County, No. 97-2-0060c, coordinated with Skagit County Growthwatch v. Skagit County, No. 07-2-0002, 2009 WL 419365, at *3 (Wash. Growth Mgmt. Hr'gs Bd. Jan. 21, 2009) ("While the ordinance that is adopted to cure non-compliance is entitled to a presumption of validity, nevertheless, the local jurisdiction must still demonstrate to the Board that it has addressed the area of

8

non-compliance identified in the [final decision and order.]"). This language is similar to the language of cases according deference to city and county planning actions prior to a finding of invalidity. See Quadrant Corp., 154 Wn.2d at 238.

*Appellate Court Review of Board Decision*

On appeal from a decision of the Board, the appellate court reviews the decision of the Board and accords deference to the Board's determination of the GMA's requirements. Soccer Fields, 142 Wn.2d at 553; Lewis County, 157 Wn.2d at 498.

The appellate court applies the standards of the Administrative Procedure Act (APA), chapter 34.05 RCW, directly to the record before the Board. Soccer Fields, 142 Wn.2d at 552-53. Under the APA, "[t]he burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

"[D]eference to county planning actions, that are consistent with the goals and requirements with the GMA, supersedes deference granted by the APA and courts to administrative bodies in general." Quadrant Corp., 154 Wn.2d at 238. But "this deference ends when it is shown that a county's action are in fact a 'clearly erroneous' application of the GMA." Quadrant Corp., 154 Wn.2d at 238.

*Summary*

The City's comprehensive plans and development regulations are presumed valid when adopted, and thus are owed deference by the Board. The Board may only overturn the City's planning actions upon a finding of clear error and that the planning action would substantially interfere with the goals of the

GMA. Upon a finding of clear error, the Board may remand the planning action to the City to take remedial actions to bring the planning action into compliance with the GMA. Although these remedial actions are also presumed valid when enacted, the City has the burden of showing that it has brought the planning action into compliance with the GMA. The Board applies the same clear error standard in its review of the remedial actions taken.

This court applies the standards of the APA to the decision of the Board. If the Board's order correctly found that the City's planning action was clear error, this court defers to the Board's determination of the GMA's requirements. But if this court determines that the Board erred when it found clear error or did not give sufficient deference to the City, this court gives deference to the City's planning action.

Board Legal Errors

Heritage argues that the Board made several legal errors in its 2016 order when it determined that Heritage was still noncompliant with the GMA. The Board responds that Heritage's assignments of legal error are barred by the law of the case and the doctrine of issue preclusion. The Board argues in the alternative that it properly applied the law and that Heritage's arguments rely on inapplicable law. We conclude that Heritage's assignments of legal error are not barred by issue preclusion because Heritage was not in privity with the City at the time of the Board's 2014 order. But we also conclude that the Board did not err in its 2016 order.

*Issue Preclusion*

The Board argues that Heritage's assignments of error 3, 4, and 5 are barred by the law of the case and the doctrine of issue preclusion because Heritage failed to appeal the Board's 2014 order. We conclude that Heritage was not in privity with the City at the time of the 2014 order, and thus Heritage's arguments are not barred by issue preclusion.

"An unchallenged conclusion of law becomes the law of the case." King Aircraft Sales, Inc. v. Lane, 68 Wn. App. 706, 716, 846 P.2d 550 (1993). Issue preclusion, also called collateral estoppel, bars a party from arguing an issue that has been previously decided. Shoemaker v. City of Bremerton, 109 Wn.2d 504, 507, 745 P.2d 858 (1987).

The elements of issue preclusion are

(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied.

Malland v. State Dep't of Ret. Sys., 103 Wn.2d 484, 489, 694 P.2d 16 (1985).

In general, "privity describes a 'mutual or successive relationship to the same right or property.'" World Wide Video of Wash., Inc. v. City of Spokane, 125 Wn. App. 289, 306, 103 P.3d 1265 (2005) (quoting Hackler v. Hackler, 37 Wn. App. 791, 794, 683 P.2d 241 (1984)). "Its binding effect flows from the fact that the successor who acquires an interest in the right is affected by the adjudication in the hands of the former owner." World Wide Video, 125 Wn. App. at 306.

Privity in the context of collateral estoppel is "applied cautiously due to the danger of depriving a nonparty of its day in court." Stevens County v. Futurewise, 146 Wn. App. 493, 508, 192 P.3d 1 (2008). Privity has been found in the context of collateral estoppel between a seller and buyer of real property, the owner of property and a successor in interest, and between a guardian and a ward. See Riblet v. Ideal Cement Co., 54 Wn.2d 779, 345 P.2d 173 (1959) (seller and buyer); In re Rynning's Estate, 1 Wn. App. 565, 462 P.2d 952 (1969) (property and successor in interest); Bull v. Fenich, 34 Wn. App. 435, 661 P.2d 1012 (1983) (guardian and ward).

Here, the Board has not demonstrated that Heritage and the City held a mutual or successive relationship to the same right or property. The Board argues that Heritage was in privity with the City at the time of the 2014 order because its position in support of the rezone was consistent with that of the City.[7] But the Board has not cited precedent holding that the owner of a subject property with a consistent position regarding a rezone was in privity with the enacting municipality. The Board has not otherwise demonstrated that having the same position in favor of the rezone is sufficient to give rise to a finding of privity between Heritage and the City. Because the Board has not demonstrated that Heritage and the City were in privity with one another at the time of the 2014 order, we conclude that Heritage's present claims of legal error are not barred by issue preclusion. We need not reach the other elements of issue preclusion.

---

[7] The Board cites to Heritage's statement in its motion to intervene that its position was consistent with that of the City.

*City Environmental Regulations*

Heritage argues that the Board erred by requiring analysis of environmental impacts to areas of the Property that are protected by the City's regulations. Because the SEIS was required to consider environmental impacts within critical areas contained within the Property because the entire Property was subject to the rezone, we disagree.

The requirements for environmental analyses vary based on whether the planning action at issue is a project action or a nonproject action. "A project action involves a decision on a specific project, such as a construction or management activity located in a defined geographic area." WAC 197-11-704(2)(a). "Non-project actions involve decisions on policies, plans, or programs," including "[t]he adoption or amendment of comprehensive land use plans or zoning ordinances." WAC 197-11-704(2)(b)(ii); see also WAC 197-11-774.

A "county, city, or town reviewing a project action" may determine that the adverse environmental impacts of the proposed action are addressed sufficiently under SEPA by its existing development regulations, comprehensive plan, or other applicable rules. RCW 43.21C.240(1), (2); see also WAC 197-11-158 (rule allowing counties or cities to rely on existing plans, laws, and regulations for project actions).

But a county, city, or town may not rely on its existing plans, laws, and regulations when evaluating the adverse environmental impacts of a nonproject action. Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd., 176 Wn. App. 555, 578 n.4, 309 P.3d 673 (2013). Rather, "an EIS is adequate [under SEPA] in a

nonproject zoning action where the environmental consequences are discussed in terms of the maximum potential development of the property under the various zoning classifications allowed." Ullock v. City of Bremerton, 17 Wn. App. 573, 581, 565 P.2d 1179 (1977).

Here, Heritage's reliance on the City's existing laws and regulations exception for project actions is misplaced.[8] The reclassification at issue concerns an amendment to the City's comprehensive plan and the rezoning of the entire Property from LOS to GC. Thus, it is a nonproject action. As a nonproject action, the SEIS had to evaluate all possible adverse environmental consequences of the rezone and could not rely on the City's existing environmental regulations in order to be adequate under SEPA. We conclude that the Board did not err when it determined that the SEIS improperly relied on the City's existing environmental regulations.

*Remote and Speculative Consequences*

Heritage argues that the Board erred by requiring Heritage to address remote and speculative consequences of its actions in its 2016 order. Because the 2016 order properly determined that the SEIS was insufficient due to its failure to analyze the potential environmental impacts of rezoning the entire Property, we disagree.

"EIS adequacy refers to the legal sufficiency of the environmental data contained in the impact statement." Klickitat County Citizens Against Imported

---

[8] Heritage raises several arguments challenging specific aspects of the Board's 2016 order based on the City's existing environmental regulations. See Appellant's Opening Br. at 31-33 (e.g., challenging the Board's required evaluation of a "'reasonable use exception'"). For the reasons stated in this section, we reject these arguments.

Waste v. Klickitat County, 122 Wn.2d 619, 633, 860 P.2d 390 (1993), 866 P.2d 1256 (1994). To be adequate, the EIS must satisfy the "rule of reason," which requires that the EIS provide a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences'" of the agency action at issue to inform the decision-makers. Cheney v. Mountlake Terrace, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976) (quoting Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974)).

Although an EIS must discuss the environmental consequences of a nonproject zoning action in terms of the maximum potential development of the property to be adequate under SEPA, SEPA "does not require that every remote and speculative consequence of an action be included in the EIS." Solid Waste Alternative Proponents v. Okanogan County, 66 Wn. App. 439, 442, 832 P.2d 503 (1992).

"Whether an EIS is adequate is a question of law, subject to review de novo." Klickitat County, 122 Wn.2d at 632. "Although review is de novo, the court must give 'substantial weight' to the governmental agency's determination that an EIS is adequate under SEPA." Klickitat County, 122 Wn.2d at 633 (citing RCW 43.21C.090; Citizens for Clean Air v. City of Spokane, 114 Wn.2d 20, 34, 785 P.2d 447 (1990)). The court examines "'whether the environmental effects of the proposed action and reasonable alternatives are sufficiently disclosed, discussed and that they are substantiated by supportive opinion and data.'" Leschi Imp. Council v. Wash. State Highway Comm'n, 84 Wn.2d 271, 286, 525 P.2d 774, 804 P.2d 1 (1974) (internal quotation marks omitted) (quoting *The National*

*Environmental Policy Act: What Standard of Judicial Review?*, 39 J. Air L. & Com. 643, 654 (1973)).

Here, to be adequate under SEPA, the SEIS had to discuss and disclose the probable adverse environmental consequences based on the maximum possible development of the Property. Heritage's specific challenges to the Board's determination that the SEIS was inadequate rely on the assumption that the developable area of the Property would be limited.[9] As discussed above, Heritage may not rely on the City's existing laws, plans, and regulations to lessen its environmental review burden for the present nonproject action. This includes the limitation of developable land relied on by Heritage. Therefore, we conclude that the Board properly concluded that the SEIS was legally insufficient because it did not analyze the potential environmental impacts.

Heritage argues that the Board improperly required it to consider the impact that natural forces or the activities of uphill property owners could have on landslide and erosion hazards in the Property. In its 2016 order, the Board discussed the known landslide activity that could occur after extended periods of precipitation "with or without other factors (such as activities at the top of the slope)."[10] The Board noted that the SEIS did not examine the impact of development on these landslide hazards, water features, and water quality. Thus, the SEIS failed to

---

[9] See Appellant's Opening Br. at 35-37 (arguing that the City's regulations limited the developable area of the Property, that the Board improperly focused on the existence of a "'reasonable use exception'" to the City's regulations, that landslide and erosion hazard analysis was unnecessary because the "developable area is located physically well away from the slope" in light of the City's regulations, and that the wetland and stream areas in the Property were protected from development by the City's regulations).

[10] CP at 1850.

consider both the Property's existing risks and how those would be impacted by future development. We reject Heritage's argument.

*Analysis of Project-Specific Actions*

Heritage argues that the Board erred in its 2016 order by requiring Heritage to evaluate the environmental impacts of project actions, such as compensatory flood storage, although the rezone at issue is a nonproject action. Because the SEIS mistakenly assumed that the City would require compensatory storage as mitigation under its existing regulations for project actions, we disagree.

"A project action involves a decision on a specific project, such as a construction or management activity located in a defined geographic area." WAC 197-11-704(2)(a). "Non-project actions involve decisions on policies, plans, or programs," including "[t]he adoption or amendment of comprehensive land use plans or zoning ordinances." WAC 197-11-704(2)(b)(ii); see also WAC 197-11-774.

A lead agency preparing an EIS for a nonproject proposal is accorded more flexibility under SEPA because generally there is less detailed information available on environmental impacts and subsequent project proposals. WAC 197-11-442(1); see Cascade Bicycle Club v. Puget Sound Reg'l Council, 175 Wn. App. 494, 514, 306 P.3d 1031 (2013) (accepting a nonproject EIS that "evaluate[d] environmental effects at a relatively broad level"). The EIS for a nonproject action concerning a specific area may include specific site analyses, and should identify "subsequent actions that would be undertaken . . . as a result of the nonproject proposal, such as transportation and utility systems." WAC 197-11-442(3).

"Any governmental action may be conditioned or denied . . . based upon policies identified by the appropriate governmental authority and incorporated into regulations, plans, or codes which are formally designated by the agency . . . as possible bases for the exercise of authority [under SEPA]." RCW 43.21C.060. "Such action may be conditioned only to mitigate specific adverse environmental impacts which are identified in the environmental documents prepared [pursuant to SEPA]." RCW 43.21C.060.

The adequacy of an EIS is reviewed de novo, with substantial weight given to the Board's determination of adequacy. Klickitat County, 122 Wn.2d at 633.

Here, Heritage mistakenly assumed that the MMC would require future project actions to perform compensatory flood storage mitigation activities. The SEIS relied on preliminary 2007 FIRMs, which placed the Property in a 100-year floodplain. The City has not adopted the 2007 FIRMs. Based on the 1999 FIRMs that have been adopted by the City, the Property is in a 500-year floodplain. The MMC does not require compensatory storage for fill activities in a 500-year floodplain. Because the City still considered the Property to be in a 500-year floodplain, the current MMC did not require mitigation through compensatory storage following cut and fill activities on the Property. Thus, the SEIS clearly erred when it based its fill, compensatory flood storage, and habitat enhancement conclusions on the mistaken assumption that the Property was located in a 100-year floodplain.

Absent other analysis properly examining the probable adverse environmental impacts to the Property as a 500-year floodplain, the SEIS's

discussion was inadequate under SEPA because it did not provide decision-makers with sufficient information to make a reasoned decision. We conclude that the Board did not err when its 2016 order determined that the SEIS did not sufficiently analyze the probable adverse environmental impacts of developing the Property.

Heritage argues that the Board failed to demonstrate sufficient deference to Heritage's environmental determinations because it "made patently sweeping and unjustifiable conclusions that reflected the Board's predilection against the reclassification," and cites to the Board's discussion about the impact of residential and commercial construction.[11] The Board's 2016 order concluded that a mistake had been made when the SEIS stated that construction of five residential homes would displace habitat while commercial alternatives would improve habitat. Heritage's argument relies on the same assumption that future project actions, such as construction of commercial development, would be required to perform mitigation actions, such as compensatory storage for fill activities. For the reasons stated above, the SEIS's reliance on the requirement of compensatory storage as a mitigation measure is misplaced because the MMC does not currently mandate such mitigation actions. We disagree.

*Summary*

We conclude that Heritage's claims of legal error in this appeal are not barred by issue preclusion because the Board has not shown that Heritage and the City were in privity at the time of the 2014 order. But Heritage's claims of legal

---

[11] Appellant's Opening at 27-28.

error are without merit. The SEIS clearly erred when it failed to analyze the possible adverse environmental impacts of the maximum possible development of the rezone by relying on its existing regulations. Similarly, the SEIS clearly erred when it failed to provide a reasonably thorough discussion of the probable environmental impacts by assuming that the City's regulations would limit the developable area of the Property. The SEIS also clearly erred when it based its fill, compensatory flood storage, and habitat enhancement conclusions on the inaccurate assumption that the Property was located in a 100-year floodplain under the MMC. Thus, the Board did not demonstrate insufficient deference to the City's planning actions when it properly concluded that the SEIS contained clear legal errors. Therefore, in light of our deference to the Board's determination of what the GMA requires, we conclude that the Board did not commit legal error in its 2016 order.

## Discretion in Choosing Method of Compliance

Heritage argues that the City had discretion to determine how to comply with the GMA and, therefore, the 2016 order demonstrates insufficient deference to the City's planning actions. We disagree.

"[T]he GMA does not prescribe a single approach to growth management," and local governments have discretion in creating their comprehensive plans and development regulations. Phoenix Dev., Inc. v. City of Woodinville, 171 Wn.2d 820, 830, 256 P.3d 1150 (2011); Diehl v. Mason County, 94 Wn. App. 645, 650, 972 P.2d 543 (1999) (citing RCW 36.70.010-.901). This discretion extends to a city's choice of how to bring legislation into compliance with the GMA. Suquamish

20

Tribe v. Kitsap County, No. 07-3-0019c, 2012 WL 5755954, at *2 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Feb. 6, 2012); Suquamish Tribe, No. 07-3-0019c, 2012 WL 864905 (Feb. 21, 2012). But the local government must still comply with other requirements of the GMA when exercising its discretion regarding methodology. Diehl, 94 Wn. App. at 650.

Here, the Board's 2016 order did not reject the City's choice of methodology for complying with the GMA. The Board stated that the City's choice to draft an SEIS was not a clearly erroneous approach to achieve compliance.[12] Rather, the Board found that the City did not adequately address the GMA's planning goal of protecting the environment because the contents of the SEIS were insufficient under SEPA. Thus, the Board rejected the content of the City's plan but did not infringe on the City's discretion to choose a method of achieving compliance. We reject Heritage's argument.

### Determination of Invalidity Based on SEPA

Heritage argues that the Board erred when its 2016 order relied on SEPA alone to invalidate the 2015 ordinances. Specifically, Heritage argues that the Board's 2016 order did not sufficiently demonstrate how the 2015 ordinances would substantially interfere with the GMA's goal of protecting the environment. Because the 2016 order contains significant analysis of the SEIS's inadequacy and gives additional reasons why the 2015 ordinances would substantially interfere with the GMA's goal of protecting the environment, we disagree.

---

[12] CP at 1823 ("**Conclusion of Law:** A supplemental EIS was not a clearly erroneous approach to compliance under these facts.").

One of the GMA's planning goals is to "[p]rotect the environment and enhance the state's high quality of life, including air and water quality, and the availability of water." RCW 36.70A.020(10). If the Board determines that a plan or regulation constitutes a "major violation of the GMA, the growth board has the option of determining that the plan or regulation is invalid." Town of Woodway v. Snohomish County, 180 Wn.2d 165, 175, 322 P.3d 1219 (2014).

Generally, the Board may not declare a plan invalid based solely on a violation of SEPA. See Town of Woodway v. Snohomish County, 172 Wn. App. 643, 660-61 n.22, 291 P.3d 278 (2013) (noting this court's decision in Davidson Serles & Assocs. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 159 Wn. App. 148, 158 n.8, 244 P.3d 1003 (2010), and acknowledging that the Board had never previously invalidated an ordinance based solely on SEPA noncompliance); see also Davidson Serles, 159 Wn. App. at 158 ("On the appropriate facts, the Board could find that failure to properly conduct the required environmental review for a city or county action interfered with fulfillment of the GMA's environmental goal and, upon such a finding, could invalidate the relevant ordinance.").

"A county or city subject to a determination of invalidity . . . has the burden of demonstrating that the ordinance or resolution it has enacted in response to the determination of invalidity will no longer substantially interfere with the fulfillment of the goals of [the GMA.]" RCW 36.70A.320(4). "[T]he question is not whether the action to remedy the invalidity itself complies with the GMA, but whether the remedial action in response to the invalidity finding 'will no longer substantially

interfere' with the GMA." Miotke v. Spokane County, 181 Wn. App. 369, 382, 325 P.3d 434 (2014) (quoting RCW 36.70A.320(4)).

Here, the Board's 2014 order noted that noncompliance with SEPA alone was insufficient to justify invalidating the 2013 ordinances. The Board went on to invalidate the 2013 ordinances because the FEIS was insufficient to inform decision-makers of the probable adverse environmental impacts and because the majority of the Property contained critical areas and shorelines that would be harmed without proper environmental review.

Following remand, Heritage bore the burden of demonstrating that the 2015 ordinances would no longer substantially interfere with the GMA's goals following its remedial actions undertaken in response to the 2014 order. Heritage's scope of work focused on conducting further environmental analyses and producing the SEIS to bring the rezone into compliance with SEPA and the GMA.

In its 2016 order, the Board determined that these environmental analyses did not demonstrate that the 2015 ordinances would not interfere with the GMA. For example, as discussed above, the SEIS failed to analyze the adverse environmental impacts that would result from the entire rezoned Property being developed, and mistakenly assumed that the MMC would require future projects to include compensatory storage as mitigation.

The Board concluded that the SEIS was inadequate under SEPA, such that the 2015 ordinances would still substantially interfere with the GMA's goal of protecting the environment. Therefore, the Board's finding of invalidity was based in part on Heritage's failure to meet its burden of showing that its remedial actions

had cured the defects identified by the Board. We conclude that the 2016 order did not invalidate the 2015 ordinances on the basis of SEPA alone.

Heritage argues that the Board erred by not including sufficient findings of fact and conclusions of law specifically related to the GMA in its 2016 order. The Board must "[i]nclude[] in the final order a determination, supported by findings of fact and conclusions of law, that the continued validity of part or parts of the plan or regulation would substantially interfere with the fulfillment of the goals of [the GMA]." RCW 36.70A.302(1)(b).

Here, in its 2016 order, the Board provided numerous findings of fact and conclusions of law relating to the SEIS. These findings of fact and conclusions of law supported its ultimate determination that the SEIS was inadequate under SEPA, and thus the 2015 ordinances would substantially interfere with the GMA's goal of protecting the environment. We conclude that the Board provided the requisite findings of fact and conclusions of law in support of its determination that the SEIS was inadequate under SEPA.

Heritage also argues that the Board erred because it did not make a finding or conclusion related to the GMA to support its determination of invalidity. Specifically, Heritage contends that the 2016 order had to include "new and specific findings and conclusions tied to the SEIS and how the 2015 ordinances were so egregious as to represent a *major* violation of the GMA."[13] Because Heritage does not offer legal authority in support of this argument, we reject it. RAP 10.3(a)(6).

---

[13] Appellant's Reply Br. at 21.

## Findings of Fact and Conclusions of Law

*Statutory Sufficiency*

Heritage argues that the Board erred when it did not include sufficient findings of fact, conclusions of law, or clear remand instructions in its 2016 order to support its determination of invalidity. Because the 2016 order contains numerous findings of fact and conclusions of law that support its determination of invalidity and because the 2016 order clearly invalidated the 2015 ordinances in full, we disagree.

The Board may determine that all or part of a comprehensive plan or development regulations is invalid if it:

> (a) Makes a finding of noncompliance and issues an order of remand under RCW 36.70A.300;
>
> (b) Includes in the final order a determination, supported by findings of fact and conclusions of law, that the continued validity of part or parts of the plan or regulation would substantially interfere with the fulfillment of the goals of this chapter; and
>
> (c) Specifies in the final order the particular part or parts of the plan or regulation that are determined to be invalid, and the reasons for their invalidity.

RCW 36.70A.302(1).

Here, the Board's 2016 order entered an order of invalidity with regard to the 2015 ordinances and remanded the entirety of the 2015 ordinances to be brought into compliance with the GMA and SEPA. The Board's 2016 order included numerous findings of fact and conclusions of law supporting its determination of invalidity. These findings and conclusions sustain the Board's ultimate conclusion that the SEIS was inadequate under SEPA, and that the 2015

25

ordinances would substantially interfere with the GMA's goal of protecting the environment. Thus, the Board's 2016 order properly made a finding of noncompliance, provided a determination of invalidity, supported that determination with findings of fact and conclusions of law, and remanded the entirety of the 2015 ordinances based on its conclusion that they would substantially interfere with the GMA's goal of protecting the environment. We conclude that the 2016 order complied with RCW 36.70A.302(1).

*Factual Findings & Assignments of Error*

Heritage argues that several of the Board's factual statements[14] or findings of fact do not demonstrate sufficient deference to the City's environmental determinations. Heritage provides a general assignment of error, and does not challenge specific findings of fact made by the Board.[15] "A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number." RAP 10.3(g). Because Heritage failed to comply with RAP 10.3(g), we decline to reach its argument.

Here, Heritage provides a general assignment of error. It does not provide separate assignments of error challenging specific findings of fact made by the Board in its 2016 order. We decline to address Heritage's challenges.

---

[14] Heritage challenges several statements made by the Board that were not part of a finding of fact or conclusion of law.

[15] Appellant's Opening Br. at 3 ("Did the Board err by failing to enter substantive and specific findings and conclusions to support invalidity?"); see also Appellant's Opening Br. at 3 (issues pertaining to assignments of error 8 and 9).

Affirmed.

<u>Trickey, J</u>

WE CONCUR:

<u>Dwyer, J.</u>